DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
 {¶ 1} Appellant, Cynthia Caccavale, appeals from the judgment of the Lorain County Court of Common Pleas. This Court affirms.
 I. {¶ 2} On February 5, 1999, Brian Mango, an agent of Appellees, the Western Southern Life Insurance Co., et al. ("WS"), sold Appellant, Cynthia Caccavale, a policy of life insurance on her life, in the amount of $65,000. The policy contained a family rider for a $5000 death benefit on the life of Caccavale's *Page 2 
daughter, Antonia Pyland. Pyland was 14 years old at the time. Question #18 of the life insurance application read as follows:
 "Has anyone proposed for this insurance ever used marijuana, LSD, barbiturates, cocaine, heroin, or other narcotic or other habit-forming drug other than those properly prescribed by a physician or been diagnosed, treated, or advised to be treated for alcoholism or drug abuse?"
 {¶ 3} Similarly, Question #20 asked Caccavale to respond truthfully to the following question concerning the physical and mental health of all persons proposed for insurance:
 "In the past ten years, has anyone proposed for this insurance had or been treated for any abnormality or disease of the heart, lungs, kidneys, or any other part of the body, or been treated for high blood pressure, diabetes, stroke, cancer or a mental or nervous condition?"
 {¶ 4} Despite Caccavale's knowledge that her daughter had used marijuana and had been treated for both alcohol and marijuana abuse, the policy application reflects that either she or Mango checked the "No" box corresponding to Question #18.[1] Although Caccavale responded "Yes" to Question #20, she failed to disclose that Pyland had received treatment for mental health problems. Caccavale represented that her responses to the questions in the life insurance application were true and complete by signing the following statement which appeared in bold-faced, capitalized print on her application: *Page 3 
 "I (WE) HAVE CAREFULLY REVIEWED EACH AND EVERY STATEMENT AND ANSWER ON PAGES 1 AND 2 OF THIS APPLICATION AND REPRESENT THAT THEY ARE TRUE AND COMPLETE TO THE BEST OF MY (OUR) KNOWLEDGE AND BELIEF."
 {¶ 5} On March 7, 1999, WS issued Caccavale an insurance policy in the amount of $65,000, with a rider on the life of Pyland in the amount of $5000.
 {¶ 6} When Pyland was 16 years old, she had a baby. In an effort to secure the future of her grandchild, Caccavale sought a life insurance policy for Pyland. On June 6, 2000, Caccavale executed a WS life insurance policy for $100,000. Caccavale also purchased this policy through Mango. On the day she executed the policy, Caccavale gave Mango a check for $27, the amount of the first month's premium on the $100,000 policy. In return, Mango gave Caccavale a receipt ("Binder") which served to provide insurance on Pyland's life from June 6, 2000, the date of the application, in an amount not to exceed $50,000, subject to certain limitations. The Binder stated that Caccavale's $27 check was "accepted subject to collection." Further, the Binder stated that WS would not provide any insurance on Pyland's life unless she was in good health as of the date of the application. The Binder also included a limitation that the insurance would not take effect if the amount paid for insurance when the application was signed was less than one month's premium for the policy. *Page 4 
 {¶ 7} This policy issued on June 21, 2000. The effective date on the policy was June 23, 2000. Tragically, Pyland was killed on June 22, 2000, when she was struck by a vehicle while crossing a road.
 {¶ 8} When the policy issued, WS attempted to negotiate Caccavale's $27 check. Caccavale's check was dishonored for insufficient funds. Caccavale testified in her deposition that sometime after Pyland's death, Mango brought the dishonored check to her. Caccavale gave him $30 cash to redeem the dishonored check. At some point, WS attempted to return the $30 to Caccavale. Caccavale testified that she refused to accept the money. The $30 is still held on WS's record books.
 {¶ 9} On July 1, 2000, WS received Caccavale's Statement of Claimant in which she requested benefits under both the 1999 rider and the 2000 policy issued in Pyland's name. On July 1, 2000, Caccavale also executed an Authorization for Release of Information, affording WS permission to obtain "any information concerning diagnosis, treatment and prognosis relative to any physical or mental condition, or treatment relative to drug or alcohol use * * * of the person on whom claim was presented, and any other non-medical information concerning such person[.]"
 {¶ 10} In September of 2000, WS informed Caccavale that her claims for death benefits on the 1999 rider and the June 2000 policy would be denied. Caccavale initially filed a complaint against WS in the Cuyahoga County Court *Page 5 
of Common Pleas on December 22, 2005. She later voluntarily dismissed her complaint and refiled it in the Lorain County Court of Common Pleas on February 22, 2006. Caccavale alleged six claims in her complaint. Under Counts I and II, Caccavale alleged that WS breached its contract with her when it denied coverage under her two policies. Under Count III, Caccavale alleged that WS gave her the Binder after she gave it the $27 check for the first month's premium on the $100,000 policy. She asserts that, pursuant to this Binder, she was entitled to the $100,000 policy amount. She alleged that WS's attempts to limit its liability to $50,000 were void as against public policy. Under Count IV, Caccavale alleged that WS acted in bad faith in denying her claims for coverage. Under Count V, Caccavale alleged negligence. Under Count VI, Caccavale alleged that the provisions of WS's policies under which it denied her recovery for the full amount of the policies were void as against public policy.
 {¶ 11} On May 11, 2006, the trial court granted in part WS's motion to strike Counts III, V and VI of Caccavale's complaint. The trial court struck Counts III and VI from the record, but declined to strike Count V. WS filed a motion for partial summary judgment on Counts I, II, and IV of Caccavale's complaint. Caccavale responded in opposition. On January 24, 2007, the trial court granted WS's motion for partial summary judgment. On February 15, 2007, the trial court granted Caccavale's motion to dismiss Count V of her complaint. Caccavale timely appealed the trial court's order, raising three *Page 6 
assignments of error for our review. We have combined two of Caccavale's assignments of error to facilitate our review.
 II. ASSIGNMENT OF ERROR I "THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT IN FAVOR OF [WS] WHEN THERE WERE MATERIAL ISSUES OF FACT UPON WHICH REASONABLE MINDS MIGHT COME TO DIFFERENT CONCLUSIONS."
 {¶ 12} In her first assignment of error, Caccavale asserts that the trial court erred in granting summary judgment in favor of WS when there were material issues of fact upon which reasonable minds might reach different conclusions. We disagree.
 {¶ 13} This Court reviews an award of summary judgment de novo.Grafton v. Ohio Edison Co. (1996), 77 Ohio St.3d 102, 105. We apply the same standard as the trial court, viewing the facts of the case in the light most favorable to the non-moving party and resolving any doubt in favor of the non-moving party. Viock v. Stowe-Woodward Co. (1983),13 Ohio App.3d 7, 12.
 {¶ 14} Pursuant to Civil Rule 56(C), summary judgment is proper if:
 "(1) No genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party." Temple v. Wean United, Inc. (1977), 50 Ohio St.2d 317, 327. *Page 7 
 {¶ 15} The party moving for summary judgment bears the initial burden of informing the trial court of the basis for the motion and pointing to parts of the record that show the absence of a genuine issue of material fact. Dresher v. Burt (1996), 75 Ohio St.3d 280, 292-93. Specifically, the moving party must support the motion by pointing to some evidence in the record of the type listed in Civ.R. 56(C). Id. Once this burden is satisfied, the non-moving party bears the burden of offering specific facts to show a genuine issue for trial. Id. at 293. The non-moving party may not rest upon the mere allegations and denials in the pleadings but instead must point to or submit some evidentiary material that demonstrates a genuine dispute over a material fact. Henkle v.Henkle (1991), 75 Ohio App.3d 732, 735.
 {¶ 16} On appeal, Caccavale asserts that genuine issues of fact remain as to (1) whether Mango supplied incorrect information for Pyland's health history on the application, (2) whether Pyland was in poor health on the date of the application, (3) whether Caccavale knowingly, intentionally and fraudulently provided false information on the policy applications, (4) whether the alleged false statements were material under R.C. 3911.06, (5) whether Mango knew of the falsity of the answers, (6) whether WS denied the claims in bad faith and defended the lawsuit in bad faith, (7) whether Caccavale paid for the insurance policy for which she applied according to WS's custom and practice. *Page 8 
 {¶ 17} In addition, Caccavale asserts that WS violated Ohio law by attempting to limit its exposure on the Binder to $50,000 when the policy and premium were for $100,000. Caccavale also contends that, pursuant to R.C. 3911.04, WS is estopped from raising fraud as a defense when it failed to deliver the policy to her within 30 days of her demand for the policy. Lastly, Caccavale asserts that the trial court erred in ignoring documentary evidence she received from WS in discovery.
1999 Rider {¶ 18} Upon review, we find that Caccavale's signature on her 1999 insurance application adopted and ratified the false statements contained therein, regardless of whether she specifically provided the answers and/or whether she failed to review the application.
 {¶ 19} R.C. 3911.06 provides the circumstances under which an insurer may use an answer to an interrogatory by an applicant for life insurance as a bar to recovery. The Ohio Supreme Court, construing R.C. 3911.06, has determined that:
 "An insurer may establish an answer to an interrogatory by an applicant for life insurance as a bar to recovery upon a policy by clearly proving that (1) in giving such answer, the applicant willfully gave a false answer (2) such answer was made fraudulently (3) but for such answer the policy would not have been issued and (4) neither the insurer nor its agent had any knowledge of the falsity of such answer." Jenkins v. Metro. Life Ins. Co., 171 Ohio St. 557, paragraph one of the syllabus, citing R.C. 3911.06. *Page 9 
 {¶ 20} "An individual will be viewed as having ratified the answers on an insurance application, if the individual signs the application."Abdul El-Ha'Kim v. American General Life and Acc. Co. (Aug. 20, 1999), 7th Dist. No. 97 CA 6, at *3, citing Ed Schory Sons, Inc. v. SocietyNatl. Bank (1996), 75 Ohio St.3d 433, 441. Furthermore, an insurance applicant will be deemed to have adopted his statements on the application regardless of whether he reviewed the application, if he signs the document and agrees that the statements contained therein are correct. Buemi v. Mutual of Omaha Ins. Co. (1987), 37 Ohio App.3d 113,119, citing Republic Mut. Ins. Co. v. Wilson (1940), 66 Ohio App. 522. Regardless of whether the proposed insured specifically provided answers in the application, by signing the application, he adopts and ratifies all statements appearing above the signature. Id.
 {¶ 21} "The Ohio Supreme Court has also held that nothing more completely vitiates a contract of insurance than false answers to material questions in an insurance application." Abdul El-Ha'Kim, supra, at *3, citing Beard v. N.N. Investors Ins. Co., Inc. (1985),21 Ohio App.3d 219, 220. "Failure to disclose such conditions which affect the risk makes an insurance contract voidable at the insurer's option."Abdul El-Ha'Kim, supra, at *3, citing Stipcich v. Metro. Life Ins.Co. (1928), 277 U.S. 311, 314. *Page 10 
Applying R.C. 3911.06 {¶ 22} Here, there is no dispute that Caccavale ratified the answers on the application as she admits that she signed the application. EdSchory Sons, Inc., 75 Ohio St.3d at 441. Furthermore, she not only signed the application, but she also agreed that the statements contained in the application were "true and complete to the best of her knowledge. See Buemi, 37 Ohio App.3d 113 at 119, citing Republic Mut.Ins. Co., 66 Ohio App. 522. The application contained false answers regarding whether anyone proposed for the insurance (which included Caccavale and Pyland), had ever used drugs, been treated or advised to be treated for alcoholism or drug abuse, or had a mental condition. Our sister courts have held that when an applicant adopts and ratifies a false answer to a question on an insurance application, the applicant's response is "willfully false" and "fraudulently made", for purposes of R.C. 3923.14.[2] See Buemi, supra, at 119; *Page 12 Abdul El-Ha'Kim, supra, at *4. Accordingly, no genuine issues of material fact remain regarding whether Caccavale's statements were "willfully false" or "fraudulently made".
 {¶ 23} Caccavale has failed to create a genuine issue of material fact regarding whether these false answers are "material." The record reflects that WS submitted the affidavit of its Director of Underwriting, Thomas Naegele, in support of its motion for partial summary judgment. In Naegele's affidavit, he averred that "[h]ad the above-referenced medical information been disclosed, [WS] would not have issued" the rider on the 1999 insurance application nor approved the June 2000 application.
 {¶ 24} Caccavale contends that false statements of an insured's health history do not bar the insured's recovery where the insured died by accidental means. However, one of the two cases cited by Caccavale,Western and Southern Life Ins. Co. v. Forrey (1930), 31 Ohio Law Abs. 623, pre-dates both R.C. 3911.06, which became effective in October 1953, and R.C. 3923.14, which became effective in July of 1956. The other decision cited by Caccavale, Pioneer Mut. Cas. Co. of Ohio v.Qualls (1957), 104 Ohio App. 15, was issued in 1957 and
 "No alteration of any written application for any such policy, by erasure, insertion, or otherwise, shall be made by any person other than the applicant without the written consent of said applicant, except that insertions may be made by the insurer, for administrative purposes only, in such manner as to indicate clearly that such insertions are not to be ascribed to the applicant." R.C. 3923.14. *Page 12 
does not mention R.C. 3911.06 or R.C. 3923.14. Caccavale has failed to controvert WS's evidence that the false answers were material and has therefore, failed to create a genuine issue of material fact regarding whether the false statements are material under R.C. 3911.06.
 {¶ 25} Lastly, Caccavale has failed to demonstrate that a genuine issue of material fact exists as to whether WS or Mango had any knowledge of the falsity of Caccavale's responses. Caccavale citesJude v. Prudential Ins. Co. of America (C.A.6, 1969), 407 F.2d 955, in support of her contention that a false answer by an insured on his insurance application is not a bar to his recovery on the policy if the falsity of the answer was known to the agent. Jude is factually distinguishable from the within matter.
 {¶ 26} In Jude, unlike this case, several witnesses testified that the agent had been with the insured on multiple occasions when the insured was consuming large quantities of alcohol. Id. at 956-958. The insured's wife testified that the agent once told her that he had followed her husband while he was driving his car one night and that her husband was "`all over the road;' that he `must have been loaded,' and warned that `he could really cause a bad accident.'" Id. at 957. The Jude court concluded that the agent was personally aware of the insured's problems with excessive alcohol consumption and therefore, that the agent "had knowledge" at the time he filed the application that the insured had falsely answered questions regarding his history of alcoholism. Id. at 958. *Page 13 
 {¶ 27} In contrast, here, there is no evidence that the agent "had knowledge" that Pyland suffered from drug and alcohol addictions and/or depression. The only evidence to which Caccavale points in support of her contention that Mango "knew the history of Pyland's emotional and psychiatric problems because he was familiar with Pyland and Caccavale and their family" is the following deposition testimony:
 "[Mango] was very close to us. He used to come out. I had my insurance policy. I don't know exactly. He just knew. He used to be in contact with me. He had kids, told me when his baby was born, yada, yada, because I knew Brian Mango for a long time."
 {¶ 28} In this same section of her deposition, Caccavale testified that Mango filled out all the information on the insurance form and she simply signed it. She testified that she did not remember reading the form. She further testified that neither she nor her daughter provided any of the responses on the application. In contrast, in Mango's deposition, he testified that he had no knowledge of Pyland's health history.
 {¶ 29} We find that Caccavale has failed to create a genuine issue of material fact regarding whether Mango actually knew about Pyland's emotional and psychiatric problems. She has failed to point to any specific conversation with Mango and/or any interaction, etc., wherein he learned of Pyland's emotional and psychiatric problems. Caccavale cannot create a genuine issue of material fact by generally alleging that "Mango was a family friend who knew everything about *Page 14 
her family and her daughter", without providing specific support for this contention.
 {¶ 30} Our analysis of the 1999 rider under R.C. 3911.06 is dispositive of Caccavale's claims that genuine issues of material fact remain regarding whether (1) Mango supplied incorrect information for Pyland's health history on the application, (2) whether Pyland was in poor health on the date of the application, (3) whether Caccavale knowingly, intentionally and fraudulently provided false information on the policy applications, (4) whether the alleged false statements were material under R.C. 3911.06 and (5) whether Mango knew of the falsity of the answer.
June 2000 Application and Binder {¶ 31} We find that Caccavale's breach of contract action with regard to the June 2000 application and Binder fails because she failed to provide the first month's premium prior to Pyland's death.
 {¶ 32} The necessary elements of a valid contract include "`an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object of consideration.'" Kostelnik v. Helper, 96 Ohio St.3d 1,2002-Ohio-2985, at ¶ 16, quoting Perimuter Printing Co. v. Strome,Inc. (N.D.Ohio 1976), 436 F.Supp. 409, 414. If a life insurance policy contains a provision that a policy shall not take effect until the first premium is paid, then the insurance company is not bound on *Page 15 
a policy until a premium is paid. Mahoning Assoc, Inc. v. Ohio Nat. LifeIns. Co. (1971), 29 Ohio App.2d 282, 287. Where a policy of life insurance contains a provision that a policy shall not take effect until the first premium is paid, no agent can waive such a provision. Id. at 288, citing Veser v. Guardian Life Ins. Co. (1935), 50 Ohio App. 340,343.
 {¶ 33} Caccavale's application for a life insurance policy for Pyland contained the following provision: "Except as provided in the receipt[Binder] included with this application, no insurance will take effect: (1) before this application is approved; and (2) before a policy isdelivered and the first premium * * * paid while each person to be insuredis alive and in good health" [Emphasis added.] The Binder provided that WS "will insure each person to be insured from the date of the application if all of them are in good health." However, it also contained the limitation that "[t]he insurance will not take effect ifthe amount paid for insurance when the application was signed is lessthan one month's premium * * * for the policy as applied for." [Emphasis added.] The Binder also stated that the check was accepted as payment "subject to collection."
 {¶ 34} Ohio law clearly dictates that "a dishonored check constitutes failure of payment." W. T. Grant Co. v. Lindley (1977), 50 Ohio St.2d 7,7. There is no dispute that Caccavale's check for the first month's premium was dishonored. There is also no dispute that Caccavale signed the application and therefore, *Page 16 
acknowledged that she had read the provision which explained that the insurance would not take effect if Caccavale failed to pay at least the first month's premium for the policy when she signed the application. Accordingly, Caccavale's failure to provide consideration — in the form of the first month's premium — prior to Pyland's death is dispositive of her breach of contract action with regard to the 2000 policy and Binder. Caccavale's 2000 policy and Binder failed for lack of consideration.
Evidentiary Dispute {¶ 35} Caccavale also asserts that the trial court erred in ignoring documentary evidence she received from WS in discovery. These documents were attached to the affidavit of Kimberly Rood, legal assistant to Caccavale's attorney. Caccavale attached Ms. Rood's affidavit to her response to WS's motion for partial summary judgment. The documents upon which Caccavale chiefly relies are phone call records regarding conversations between Caccavale and a WS employee.
 {¶ 36} Caccavale first asserts that the trial court ignored evidence contained in the phone records that someone at WS told her that her claim for the June 2000 policy would be honored "as if the check was not returned." However, Caccavale's attempt to redeem her dishonored check after Pyland's death has no impact on the effective date of the policy. The policy and the Binder clearly state that the insurance was not effective until the proposed insured paid one month's *Page 17 
premium. Even if someone at WS told Caccavale that her claim would be honored "as if the check was not returned", this purported agent of WS cannot waive a provision, such as the one included in the policy and the Binder, that states that the policy shall not take effect until the first premium is paid. See Mahoning Assoc, Inc., 29 Ohio App.2d at 288, citing Veser, 50 Ohio App. 340. Likewise, Mango could not waive the provision requiring payment to occur before the policy takes effect by merely accepting Caccavale's $30 cash payment after her check was dishonored.
 {¶ 37} Caccavale next contends that the trial court disregarded evidence also contained in the phone records which establishes that it was WS's policy to redeposit dishonored checks if they bounce twice. This argument similarly fails. Caccavale provided deposition testimony that she did not have a positive balance on her checking account at any time between June 9, 2000 and June 30, 2000. As such, even if WS had redeposited her check for a second time, she still would not have had sufficient funds to cover the check and therefore, pay the first month's premium prior to her daughter's June 21, 2000 death. The fact remains that even if WS had redeposited the check, the policy and/or the Binder would still not have been effective at the time of Pyland's June 21, 2000 death.
 {¶ 38} We need not address WS's contention that the affidavit of Ms. Rood and the documents attached thereto have no evidentiary value. Our *Page 18 
disposition of Caccavale's arguments regarding specific statements contained in the documents attached to Ms. Rood's affidavit is dispositive of this contention.
Estoppel {¶ 39} Caccavale also asserts that R.C. 3911.0 precludes WS from raising fraud as a defense. Caccavale contends that WS failed to deliver to her the policy with the application attached within 30 days of her demand for the policy. R.C. 3911.04 provides as follows:
 "Every life insurance company doing business in this state shall return with, and as part of any policy issued by it, to any person taking such policy, a complete copy of each application or other document held by it which is intended in any manner to affect the force or validity of such policy. A company which neglects to do so is estopped from denying the truth of any such application or other document, so long as it is in default for such copy. In case such company neglects for thirty days after demand made therefor, to furnish such copies, it is forever barred from setting up as a defense to any suit on the policy, any incorrectness or want of truth of such application or other document."
 {¶ 40} Caccavale has pointed to Ms. Rood's affidavit to support her contention that she requested the policy on July 17, 2000. However, Ms. Rood did not attest to the date on which Caccavale requested the policy. Rather, Ms. Rood authenticated the numerous documents attached to the affidavit. Caccavale has failed to specifically point to a document attached to Ms. Rood's affidavit that demonstrates the date on which she requested the policy. App.R. 16(A)(7) and Loc.R. 7(B)(6). Likewise, she has failed to support her contention that WS gave *Page 19 
her a sample copy of the policy on September 29, 2000. As such, we may disregard this portion of her assigned error. App.R. 12(A)(2).
 {¶ 41} Upon review, we find that no genuine issue of material fact remains regarding Caccavale's claim for breach of the 2000 policy and Binder. Our finding that the trial court correctly determined that WS did not breach either insurance agreement or the Binder renders Caccavale's bad faith claim moot. Caccavale's first assignment of error is overruled.
 ASSIGNMENT OF ERROR II "THE TRIAL COURT ERRED IN DISMISSING [CACCAVALE'S] COUNT VII, BINDER, WHEN THERE WAS EVIDENCE THAT A BINDER AGREEMENT WAS PROVIDED TO CACCAVALE WHEN SHE PURCHASED THE POLICYOF [SIC] LIFE INSURANCE."
 ASSIGNMENT OF ERROR III "THE TRIAL COURT ERRED IN STRIKING [CACCAVALE'S] PUBLIC POLICY CLAIM. ."
 {¶ 42} In her second assignment of error, Caccavale asserts that the trial court erred in dismissing Count VII, which pertained to the Binder, when there was evidence that WS provided the Binder to her when she purchased the June 2000 policy. In her third assignment of error, Caccavale contends that the trial court erred in striking her public policy claim.
 {¶ 43} At the outset, we note that Caccavale's complaint did not contain seven counts as she alleges in her second assignment of error; it only contained six. Count III of Caccavale's complaint concerned the Binder. Furthermore, we *Page 20 
note that the trial court granted WS's motion to strike Count III. This count was not part of the motion for partial summary judgment. The court did not, contrary to Caccavale's assertions in her second assignment of error, dismiss this count. Rather, it granted the motion to strike this count.
 {¶ 44} "`A trial court's decision to grant a motion to strike will not be overturned on appeal absent an abuse of discretion.'" Nationwide LifeIns. Co v. Kallberg, 9th Dist. No. 06CA008968, at ¶ 20, quotingMatthews v. D'Amore, 10th Dist. No. 05AP-1318, 2006-Ohio-5745, at ¶ 25. An abuse of discretion connotes more than an error of judgment, and instead demonstrates "perversity of will, passion, prejudice, partiality, or moral delinquency." Pons v. Ohio State Med. Bd. (1993),66 Ohio St.3d 619, 621. When applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court. Id.
 {¶ 45} Caccavale has failed to advance specific arguments demonstrating that the trial court abused its discretion in striking Count III (Binder) or Count VI of her complaint. Caccavale has not even mentioned the standard of review, nor has she alleged coherent legal arguments in support of her contentions that the trial court "erred" in striking or dismissing these claims. Further, she has not set forth any evidence of record to support her contention that the trial court "erred." Nonetheless, in our disposition of Caccavale's first assignment of error, we addressed her contentions regarding the enforceability of the Binder. As such, we decline to further address these assignments of error. App.R. 16(A)(7); Loc.R. *Page 21 
7(B)(7). Accordingly, Caccavale's second and third assignments of error are overruled.
 III. {¶ 46} Caccavale's assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30. *Page 22 
Costs taxed to Appellant.
SLABY, J., CONCURS
[1] The parties dispute who actually checked "No" in the box corresponding to Question #18.
[2] Both R.C. 3923.14, which governs false statements in health and accident insurance applications, and R.C. 3911.06, which governs false statements in life insurance applications, contain the same basic criteria:
 "The falsity of any statement in the application for any policy of sickness and accident insurance shall not bar the right to recovery thereunder, or be used in evidence at any trial to recover upon such policy, unless it is clearly proved that such false statement is willfully false, that it was fraudulently made, that it materially affects either the acceptance of the risk or the hazard assumed by the insurer, that it induced the insurer to issue the policy, and that but for such false statement the policy would not have been issued.