[Cite as *Manley Architecture Group, L.L.C. v. Santanello*, 2018-Ohio-2200.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Manley Architecture Group, LLC, | : | |
| Plaintiff-Appellee/<br>Cross-Appellant, | : | No. 16AP-825 |
| v. | : | (C.P.C. No. 15CV-4514) |
| Steven A. Santanello, | : | (REGULAR CALENDAR) |
| Defendant-Appellant/<br>Cross-Appellee. | : | |
| | : | |

D E C I S I O N

Rendered on June 7, 2018

**On brief:** *Olsheski Law Co., LPA,* and *Jessica L. Olsheski,* for appellee/cross-appellant. **Argued:** *Jessica L. Olsheski.*

**On brief:** *Kemp, Schaeffer & Rowe Co., LPA, Michael N. Schaeffer,* and *Richard G. Murray, II,* for appellant/cross-appellee. **Argued:** *Michael N. Schaeffer.*

APPEAL from the Franklin County Court of Common Pleas

HORTON, J.

{¶ 1} Manley Architecture Group, LLC ("MAG"), brought a breach of contract action against Dr. Steven Santanello in the Franklin County Court of Common Pleas seeking damages for unpaid architectural and construction fees. Santanello counterclaimed, alleging that MAG's failure to properly supervise and manage the construction breached the parties' agreement and violated R.C. 1345.01 et seq., the Ohio Consumer Sales Practices Act ("OCSPA"). After a bench trial, the trial court found that both parties had breached the agreement and dismissed the OCSPA claim. The trial court concluded that Santanello owed MAG $224,270.68 and offset that amount by $160,000 that MAG owed to Santanello,

resulting in a net award of $64,270.68 due to MAG. The parties cross-appealed. For the reasons set forth below, we affirm in part and reverse in part.

## I. FACTUAL AND PROCEDURAL BACKGROUND

{¶ 2}  On January 22, 2004, MAG and Santanello entered into a written contract governing the architectural design and construction of a 5,800 square foot home, as well as a "stable with riding arena, sitework, pond, tennis court and outdoor pool," for an estimated total cost of $1.6 million.  Patrick Manley, MAG's owner and architect, sent the agreement to Santanello, along with a cover letter that explained the cost saving option of having MAG operate as the "construction manager" instead of hiring a general contractor:

> The enclosed information is representative of our residential proposals, and includes all the services normally required to properly complete the project. As we discussed, a typical architectural and engineering fee for a luxury home seems to fall in the range of 10-15% of the cost of construction. This is for a full set of services and would include managing the bidding and site visits during construction. My quotation for your home is well under that amount.
>
> Regarding the construction management portion, we would work directly for you bidding out to the subcontractors and suppliers on your behalf, and managing the entire construction process. The advantage to this is we can typically save you approximately 10% to 12% over the cost of a general contractor. Added benefits are we have more involvement in the details from start to finish, you have access to all of the subcontractor bids and we can make sure the construction is performed properly.

{¶ 3}  Several provisions of the contract detailed the option of having MAG operate as the construction manager. The architect's "scope of services" included the following two provisions:

> **Bidding Phase** (Not required under Construction Management contract)
>> Provide Owner with a list of bidders who perform this type of work.
>> Meet with prospective bidders to explain design.
>> Answer questions from bidders.
>> Distribute drawings and other related information.
>
> **Construction Administration Phase** (Not required under Construction Management contract)

> Phone support for owner and contractor.
> Assist in resolving on-site problems, conflicts and unknown conditions.
> As-needed site visits during construction.
> Review shop drawings.
> Review contractor's payment requests.

{¶ 4}  The architect's maximum fee was capped at 8.0 percent to 9.5 percent of the total construction cost. The "bidding phase" and "construction administration phase" services were included, and were not to exceed 0.5 percent and 1.5 percent of the total construction cost, respectively. However, if the "construction management" option were chosen, those services were deleted from the architect's fee, reducing it to a maximum of 6.0 percent to 7.5 percent of the total construction fee. Instead, 10 percent of the total construction cost was imposed for construction management:

> **Construction Management Fee**: 10% of Construction Cost*
>
> *Typical mark-up on material, equipment and labor, by custom remodeling homebuilders acting as General Contractor, normally runs between 20% to 25% of construction cost. Net savings on project, using construction management approach should save 10%-15% overall.

{¶ 5}  The agreement also contained a provision governing payment:

> Progress payments shall be made to the architect at the completion of each phase, or for services rendered at the end of each month, whichever occurs first. * * * In the unlikely event either party shall breach this agreement, the party at fault shall be responsible for all attorney's fees and expenses of the other party. Invoices shall be due and payable 30 days from the date of the invoice. Finance charges after the due date shall be 1 ½% per month (18% per annum).

(Mar. 1, 2016 Mot. of Def. for Partial Summ. Jgmt.; Aff. of Steven A. Santanello, Ex. A.)

{¶ 6}  During construction, problems arose with the barn roof leaking and the water height in the pond, and Santanello stopped paying invoices submitted by MAG.

{¶ 7}  A number of years after construction was finished, MAG sued Santanello for the unpaid fees. The first complaint that MAG filed stated causes of action for breach of contract, quantum meruit and unjust enrichment, but the latter two claims were time barred and omitted from an amended complaint. (May 28, 2015 Compl.; June 24, 2015 Am.

Compl.) Santanello filed counterclaims for breach of contract, alleging that MAG had breached its obligation to properly oversee the construction of the pond and barn. (July 13, 2015 Answer.)

{¶ 8} The matter proceeded to a bench trial held on August 22-25, 2016, after which the trial court issued a decision stating findings of fact and conclusions of law. In its decision, the trial court stated that the term "construction management" in the parties' agreement was ambiguous because "the [parties'] exact expectations" regarding its scope were "only loosely defined." (Nov. 18, 2016 Decision at 2.) Thus, the trial court considered both the contents of the cover letter and the language of the parties' agreement to interpret the term. *Id.* The trial court emphasized MAG's statement in the cover letter that, as construction manager, it would be able to "make sure the construction is performed properly." (Decision at 3.) After reviewing several cases construing the term, the trial court concluded:

> Considering all the evidence, including the credibility of the witnesses, this court finds that the construction management role these parties mutually agreed upon did *not* make Manley Architecture Group an insurer of the work of trade contractors such as the contractor who erected the barn and leaking roof. Manley Architecture Group did not obligate itself to, in essence, warrant or guarantee that all work by others would be "performed properly." Fairly read, the written contract documents made that clear to Dr. Santanello. Moreover, privity of contract ran between Dr. Santanello and individual contractors, even though Mr. Manley made some of the contracts as "agent" for Dr. Santanello. Because each contractor hired by Dr. Santanello remained responsible for their own performance, and any deficiencies in the work, ultimate responsibility for enforcing that work rested on the owner not Manley Architecture Group.
>
> Nevertheless, because Manley Architecture Group assumed the overarching role of "construction manager," the parties plainly did contemplate that Manley would actively monitor ongoing work. * * * When problems arose, these parties agreed that Manley Architecture Group would alert Dr. Santanello in a timely manner. Practically speaking, if a contractor was not performing work as called for in the plans and specifications properl, Dr. Santanello had a right to expect notice from Manley so that the doctor could pursue appropriate remedial action with the contractor in question.

(Emphasis sic.) (Decision at 4.)

{¶ 9} After setting forth this interpretation, the trial court made the following rulings on the parties' claims. First, the trial court addressed MAG's claims for unpaid services under the parties' agreement. The trial court noted that the parties had stipulated that MAG had paid $55,577.68 to vendors for which it had not been reimbursed. The trial court found that an additional $27,179 in "architect design fees" for a racquetball court, a gazebo, and "construction management fees" were unpaid. (Decision at 5.) This amounted to "$82,756.68 for unpaid but earned professional fees and unreimbursed out-of-pocket expenses reasonably incurred" by MAG. *Id.* After calculating the interest rate for finance charges stated in the parties' agreement, the trial court concluded that MAG was owed a $141,514, for a total of $224,270.68. (Decision at 5 & 7.)

{¶ 10} Second, the trial court found that MAG did not breach its obligation when building the pond because it "was never mutually intended by the parties to be leak-proof, or to always maintain an essentially static water level as Dr. Santanello now desires." (Decision at 6.)

{¶ 11} Third, the trial court ruled on Santanello's counterclaim concerning the construction of the barn roof. After receiving an estimate to construct the barn and its roof for $265,000, Santanello hired Bill Williams to perform the construction without a written contract. The trial court found that MAG's architectural plans for the barn and roof were adequate. Williams used a proprietary manufactured barn roof system when constructing the barn. After installation, the roof immediately began to leak through a long valley in the roof and into an apartment in the upper level of the barn. In addition, flashing was installed incorrectly and vents specified in the drawings were missing.

{¶ 12} The trial court noted that Andy Raile, an expert witness who had examined the roof, testified that it was "not repairable and cannot be made fully watertight without complete removal and replacement." (Decision at 7-8.) The trial court made the following findings and rulings concerning Manley's performance and MAG's liability for the roof:

> Initial installation of the barn roof occurred in August-September 2004. Mr. Manley testified that this roof was installed very, very quickly. Mr. Manley further acknowledged that getting up on a high roof like this one was not one of his favorite things to do. Perhaps due to the speed of initial

installation, or the fact that getting up on a high roof made Mr. Manley uncomfortable, Manley Architecture Group did not closely inspect and monitor barn roof installation. Only after leaks began to appear did Manley closely examine the roof work, which is now conceded to have been deficiently done by Williams' crew.

Although Dr. Santanello was his own general contractor, and although Manley Architecture Group had recommended against even hiring Williams for the work because they thought his proposed contract price was too low, the court finds by a preponderance of the evidence that Manley Architecture Group itself fell short of its construction management responsibilities in monitoring installation of the barn roof. Mr. Manley did not perform (or have performed by some other person more comfortable working at height) any contemporaneous close-hand inspection as the roof was installed. Once the roof was completed and closed up, even Mr. Manley conceded that it was exceedingly difficult to go back and figure out why there were leaks, or precisely identify where they were located. More attention ought to have been given to these practicalities by Manley Architecture Group as the roof work was still being performed, because serious discrepancies in the roof would have been readily apparent to a trained observer.

The preponderance of evidence established that, in 2006 dollars, complete replacement of the barn roof would have cost roughly $120,000. With inflation, that figure is roughly $160,000 in 2016 prices. Recognizing Manley Architecture Group was not a guarantor of work by Williams, it nevertheless had construction management obligations that were not met. The lack of thorough, timely inspection by Manley allowed Williams' substandard work to escape detection when, had work been checked, correction of deficient work would have been much easier and less costly.

"To recover upon a breach of contract claim, a plaintiff must prove 'the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff.' " *Jarupan v. Hanna*, 173 Ohio App.3d 284, 2007-Ohio-5081, 878 N.E.2d 66, (10th Dist.) at ¶ 18 (quoting *Powell v. Grant Med. Ctr.*, 148 Ohio App.3d 1, 10, 2002-Ohio-443, 771 N.E.2d 874) (additional citations omitted.) "In order to prove a breach by the defendant, a plaintiff must show that the defendant 'did not perform one or more of the terms of a

contract.' " *Jarupan* at ¶ 18 (quoting *Little Eagle Props. v. Ryan*, 10th Dist. No. 03AP-923, 2004-Ohio-3830, ¶ 15).

(Decision at 8-9.)

{¶ 13} Accordingly, the trial court awarded Santanello $160,000 in damages for the breach based on the defective roof. After offsetting that amount against the damages award to MAG on its breach of contract claim, the trial court concluded that a net of $64,270.68 was due to MAG.

{¶ 14} Fourth, the trial court dismissed Santanello's claim under the OCSPA.

{¶ 15} The parties filed cross-appeals concerning the trial court's award of damages to MAG under the agreement and the damages awarded for the barn roof. The rulings concerning the pond and MAG's OCSPA claim were not appealed. Santanello asserts the following assignments of error:

> I. The trial court incorrectly applied the set off in 2016 as the damages giving rise to the set off occurred when the roof was installed in 2004. The court erred in not concluding that the set off should occur on the first date that Appellant [Santanello] suffered damage (2004) when the barn roof first began to leak.
>
> II. The trial court erred in its finding that defendant owed plaintiff $55,557.68 for reimbursement of monies advanced by plaintiff/appellee because defendant/appellant was not contractually obligated to pay such sums under the contract between appellant and appellee and the court indicated that it was not making the damage award based upon [claims of] quantum meruit or unjust enrichment.

{¶ 16} MAG asserts the following cross-assignments of error:

> A. The court erred when it allowed a set-off for the barn roof; any deficiency in the installation should have been borne by the roofing subcontractor and the general contractor, Defendant Santanello, not Mr. Manley.
>
> B. The court erred when it calculated the barn roof set-off at $160,000. There was testimony that the amount of the set off should have been significantly less because the entire roof did not need to be replaced.
>
> C. The court erred when it determined that the amount of the set-off was $160,000 because Defendant Santanello failed to

mitigate his damages and seek redress with the barn roof contractor; instead he used the barn roof for ten years without making any repairs and only raised the issue of a complete barn roof replacement when Mr. Manley brought claims for breach of contract.

D. The court erred when it did not allow a reduction in the amount of the set-off for the use and enjoyment of the roof by Dr. Santanello.

E. The court erred when it found that there should be a set-off because the evidence showed that Defendant Santanello breached the contract first, thereby relieving Plaintiff of any contractual obligation whatsoever.

{¶ 17} For the reasons discussed below, we sustain Santanello's second assignment of error and MAG's first cross-assignment of error. All other assignments of error are overruled as moot.

## II. STANDARD OF REVIEW

{¶ 18} A de novo standard of review applies to matters of law, including the interpretation and construction of written contracts. *Long Beach Assn., Inc. v. Jones*, 82 Ohio St.3d 574, 576 (1998). However, a manifest weight of the evidence standard applies to appellate review of a judgment entered after a bench trial. App.R. 12(C). Under this standard, a reviewing court must be "guided by a presumption that the findings of the trier-of-fact were indeed correct." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). " 'Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence.' " *Id.*, quoting *C. E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 280 (1978).

## III. ANALYSIS

{¶ 19} We first consider Santanello's second assignment of error, in which he asserts that the trial court erred when it ruled that he breached the parties' agreement. Santanello argues that the agreement did not obligate him to reimburse MAG for the $55,557.68 that MAG had advanced to subcontractors after he refused to pay them.

{¶ 20} " 'A contract is generally defined as a promise, or a set of promises, actionable upon breach.  Essential elements of a contract include an offer, acceptance, contractual

capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration.' " *Kostelnik v. Helper*, 96 Ohio St.3d 1, 2002-Ohio-2985, ¶ 16, quoting *Perlmuter Printing Co. v. Strome, Inc.*, 436 F.Supp. 409, 414 (N.D.Ohio 1976). "A meeting of the minds as to the essential terms of the contract is a requirement to enforcing the contract." *Id.* at ¶ 16, citing *Episcopal Retirement Homes, Inc. v. Ohio Dept. of Indus. Relations*, 61 Ohio St.3d 366, 369 (1991). To be enforceable, a contract's terms "must be definite and certain." *Episcopal Retirement Homes* at 369, citing *James Ward & Co. v. Wick Bros. & Co.*, 17 Ohio St. 159, 164 (1867).

{¶ 21} "In construing any written instrument, the primary and paramount objective is to ascertain the intent of the parties. The general rule is that contracts should be construed so as to give effect to the intention of the parties." *Aultman Hosp. Assn. v. Community Mut. Ins. Co.*, 46 Ohio St.3d 51 (1989), citing *Employers' Liab. Assur. Corp. v. Roehm*, 99 Ohio St. 343, 344 (1919), syllabus; *Skivolocki v. E. Ohio Gas Co.*, 38 Ohio St.2d 244, 246 (1974), paragraph one of the syllabus. Parties are free to "contract for the terms they want, and the 'intent of the parties is presumed to reside in the language they chose to use in their agreement.' " *Hope Academy Broadway Campus v. White Hat Mgt., L.L.C.*, 145 Ohio St.3d 29, 2015-Ohio-3716, ¶ 35, quoting *Graham v. Drydock Coal Co.*, 76 Ohio St.3d 311, 313 (1996). "Intentions not expressed in the writing are deemed to have no existence and may not be shown by parol evidence." *Aultman Hosp. Assn.*

{¶ 22} Here, the parties' agreement contemplated two potential roles for MAG and Manley. Under the first option, the project would use a general contractor, and Manley would perform "construction administration" duties and oversee bidding. Under the other option, which Santanello opted for, Manley was the project's "construction manager." With this option, Santanello operated as his own general contractor and enjoyed a reduction in certain expenses. This option deleted the "bidding" and "construction administration" fees and purported to save the homeowner 10 to 15 percent over the typical cost of construction managed by a third party general contractor. With Santanello in that role, MAG charged a flat 10 percent fee for Manley to perform "construction management" services.

{¶ 23} As the trial court noted, both MAG's breach of contract claim and Santanello's counterclaim concern the scope of the "construction management" services under the agreement. The first question is whether this role authorized MAG to advance fees to

subcontractors after Santanello refused to pay them and then hold Santanello liable for those advances. It is undisputed that Santanello operated as his own general contractor. As the trial court stated, "privity of contract ran between Dr. Santanello and individual contractors," as he was the one who actually hired them. (Nov. 18, 2016 Decision at 4.)

{¶ 24} However, our de novo review of the contract reveals no provision that obligated Santanello to pay MAG for fees advanced to subcontractors that Santanello had refused to pay. The trial court simply stated that it found "by a preponderance of the evidence that [Manley] was not paid the full amount due under the parties' contract," with no mention of what provision of the contract Santanello breached by failing to reimburse Manley for the $55,577 in advances to trade contractors. (Decision at 5.) The trial court simply referred to "unpaid but earned professional fees and unreimbursed out-of-pocket expenses" as the basis for the award. *Id.* The agreement's description of "reimbursable expenses," which includes "[b]lueprints, mileage, faxes, etc. estimated at: $2,000.00" cannot be read to reflect an intent to include advances to subcontractors for building fees totaling tens of thousands of dollars.[1] (Aff. of Steven A. Santanello, Ex. A.)

{¶ 25} Finding that the "construction management" role was "only loosely defined" under the agreement, the trial court decided that the term was ambiguous, and decided to incorporate language from the cover letter into the agreement in order to define the role. (Nov. 18, 2016 Decision at 2.) It is acceptable, of course, to consult extrinsic evidence to determine the meaning of an ambiguous contract term or provision. "A court will resort to extrinsic evidence in its effort to give effect to the parties' intentions only where the language is unclear or ambiguous, or where the circumstances surrounding the agreement invest the language of the contract with a special meaning." *Kelly v. Med. Life Ins. Co.*, 31 Ohio St.3d 130, 132 (1987), citing *Blosser v. Enderlin*, 113 Ohio St. 121 (1925). However, in this case, the cover letter contains no language suggesting that the parties intended to authorize MAG to advance fees that Santanello had refused to pay:

> Regarding the construction management portion, we would work directly for you bidding out to the subcontractors and suppliers on your behalf, and managing the entire construction process. The advantage to this is we can typically save you approximately 10% to 12% over the cost of a general

---

[1] The unpaid amount of $27,179 earned architectural fees for the racquetball court and the gazebo are not in dispute on appeal.

contractor. Added benefits are we have more involvement in the details from start to finish, you have access to all of the subcontractor bids and we can make sure the construction is performed properly.

{¶ 26} In addition to the agreement itself not providing a basis for authorizing such advances, Manley himself testified that when making the advances, he was not operating under the agreement:

But I, in turn, in order to keep the project moving and to finish the project, you know, even though I had no obligation to do so, I paid a lot of these contractors and suppliers because I felt that it was unfair to them to hold money back like this on people who had done such a good job and really didn't have much more to finish. That they needed to get paid because I was really afraid we were going to lose these contractors and the project was just going to come to a grinding halt.

(Aug. 22, 2016 Tr. Vol. I at 150.)

{¶ 27} Manley also testified that Santanello "didn't want to pay certain things because certain contractors weren't done. And I thought it was withholding too much money." (Tr. Vol. I at 151.) Manley felt that "ultimately, [Santanello's withholding] went on so long and there were a couple of liens that were filed against the property." (Tr. Vol. I at 151-52.) Manley testified that because there were "contractors that didn't want to cooperate because they weren't getting paid," he "made the decision on [his] own to start to pay some of these people just to get them back to finish the work." (Tr. Vol. I at 152.)

{¶ 28} Manley's testimony demonstrates that he wanted the project to be completed and was concerned about his working relationship with the subcontractors. However, by creating an agreement that allowed a homeowner with no experience in construction to function as his own general contractor, he ran the risk that Santanello might decide to withhold payment to subcontractors on the project. In return, MAG was able to offer a contract with a reduced rate as a selling point. "It is not the responsibility or function of this court to rewrite the parties' contract in order to provide for a more equitable result." *Hope Academy Broadway Campus* at ¶ 37. "A contract 'does not become ambiguous by reason of the fact that in its operation it will work a hardship upon one of the parties thereto.' " *Foster Wheeler Enviresponse v. Franklin Cty. Convention Facilities Auth.*, 78 Ohio St.3d 353, 362 (1997), quoting *Ohio Crane Co. v. Hicks*, 110 Ohio St. 168, 172 (1924). "Unless

there is 'fraud or other unlawfulness involved, courts are powerless to save a competent person from the effects of his own voluntary agreement.' " *Hope Academy Broadway Campus* at ¶ 37, quoting *Dugan & Meyers Constr. Co. v. Ohio Dept. of Adm. Servs.*, 113 Ohio St.3d 226, 2007-Ohio-1687, ¶ 29. Although Manley appears to have operated with the best of intentions, the agreement between him and Santanello did not give him the authority to unilaterally decide that Santanello had withheld "too much money" from subcontractors, pay them, and then sue Santanello for those advances. As the existence of the liens shows, a remedy existed for the dispute between Santanello and the subcontractors.

{¶ 29} For the foregoing reasons, we conclude that the trial court erred when it construed the agreement to allow Manley or MAG the authority to advance monies to the subcontractors and subsequently recover those advances from Santanello. Accordingly, Santanello's first assignment of error is sustained, and the amount of damages awarded to MAG is reduced to $27,179 for the fees for "architect design" and "contract management," plus prejudgment interest of 18 percent, as the contract contemplated.

{¶ 30} We now turn to MAG's first cross-assignment of error, which asserts that the trial court erred by allowing a set-off in the amount of damages for the amount of a new barn roof, based on its determination that MAG breached its "construction management" responsibilities.

{¶ 31} As an initial matter, we agree with the trial court's interpretation of the scope of those responsibilities. The trial court emphasized MAG's assurance in the cover letter accompanying the agreement that it would "make sure the construction is performed properly." (Nov. 18, 2016 Decision at 3.) The trial court did not construe this statement as a warranty or "guarantee" covering the work of the subcontractors. (Decision at 4.) MAG was not "an insurer of the work of trade contracts such as the contractor who erected the barn and leaking roof." *Id.* Furthermore, "each contractor hired by Dr. Santanello remained responsible for their own performance, and any deficiencies in the work, ultimate responsibility for enforcing that work rested on the owner, not Manley Architecture Group." *Id.*

{¶ 32} We also agree with the trial court's observation that when the parties agreed that MAG would perform "the overarching role of 'construction manager,' the parties

plainly did contemplate that Manley would actively monitor ongoing work." (Decision at 4.) Thus, it was MAG's responsibility to "alert Dr. Santanello in a timely manner" when problems arose during construction, "so that the doctor could pursue appropriate remedial action with the contractor in question." *Id.*

{¶ 33} Nevertheless, the trial court's reasonable definition of MAG's construction management responsibilities cannot be reconciled with its ultimate determination that MAG breached them. The trial court ruled that MAG breached "its construction management responsibilities in monitoring installation of the barn roof" and did not "monitor [the] barn roof installation." (Decision at 8.) Santanello testified that he knew about the leaking roof "soon after it was essentially completed," at which time Manley "worked hard at trying to figure out what the problem was." (Aug. 22, 2016 Tr. Vol. III at 36-37.) At that point, Williams was still working on building the barn, and Manley "tried an attempt at once" to have Williams fix the roof. (Tr. Vol. III at 37.) Santanello testified that Manley then hired a different roofing company "to look at it" and make non-structural repairs to the roof. (Tr. Vol. III at 37-38.) Santanello's own testimony demonstrates that Manley performed the "construction management" responsibilities as the parties had intended under the agreement.

{¶ 34} By ruling that MAG was liable to Santanello for the entire cost of replacing the roof, the trial court essentially made MAG a guarantor of the roof installer, in spite of the fact that its definition of construction management expressly stated that MAG was not a guarantor for the work of the subcontractors. This ruling imposed a more stringent set of responsibilities on MAG than the trial court's own definition required. Accordingly, we sustain MAG's first cross-assignment of error, reverse the trial court's ruling in favor of Santanello on the counterclaim for breach of contract arising from the barn roof, and vacate the $160,000 in damages awarded to Santanello.

## IV. CONCLUSION

{¶ 35} Under our de novo review of the parties' agreement, the scope of MAG's "construction management" role did not authorize MAG to recover for advances to subcontractors, nor did it make MAG the guarantor of each subcontractor's work. Accordingly, the trial court's judgment is affirmed in part and reversed in part. The judgment is affirmed as to the $27,179 in unpaid architectural fees and prejudgment

interest that Santanello has not appealed, but is reversed regarding the $55,577.68 advanced by MAG to subcontractors and the $160,000 for the replacement of the barn roof. Thus, we sustain Santanello's second assignment of error and MAG's first cross-assignment of error, and render all other assignments of error as moot.

*Judgment affirmed in part and reversed in part.*

BROWN, P.J. and LUPER SCHUSTER, J., concur.

——————————————