PERLMUTER PRINTING CO., Plaintiff,

v.

STROME, INC., Defendant.

Civ. A. No. C75–725.

United States District Court,
N. D. Ohio, E. D.

April 23, 1976.

Sheldon Berns, Michael H. Diamant, Kahn, Kleinman, Yanowitz & Arnson, Cleveland, Ohio, for Perlmuter Printing Co.

Michael T. Honohan, Alan N. Hirth, Benesch, Friedlander, Coplan & Aronoff, Cleveland, Ohio, for Strome, Inc.

## MEMORANDUM OPINION AND ORDER

KRUPANSKY, District Judge.

This is a diversity action wherein plaintiff seeks compensatory damages, plus interest and costs, charging defendant with a breach of an oral contract. Defendant denies the existence of an oral contract. Jurisdiction of the Court was properly invoked pursuant to 28 U.S.C. § 1332 and, at the pretrial request of both parties, the case was tried to the Court without a jury.

Plaintiff's pre-trial Motion to Dismiss Strome Marketing, Inc. as a party defendant, is hereby granted.

Proceeding to the merits of the action, the Court notes initially that the facts elicited at trial are generally undisputed. Plaintiff Perlmuter Printing Company is an Ohio corporation engaged in the business of commercial printing. Defendant Strome, Inc. is a New Jersey corporation engaged in the business of photo-finishing. The first commercial intercourse between the parties was brief and occurred in November, 1974, when Richard Perlmuter, President of Perlmuter Printing, was requested to submit a price quotation for printing photo-processing mailer envelopes for Strome, Inc. From a sample of the mailer envelope forwarded to him by Peter Vogel, house counsel for Strome, Inc., Perlmuter calculated a cost estimate and submitted a bid proposal. Referring to Vogel's business card, Perlmuter telephoned Vogel at Strome, Inc. and submitted his proposal. The bid, however, was rejected as excessive.

The action now before the Court arose as a result of a second, unrelated transaction between the parties which was initiated during March of 1975.

Defendant Strome, Inc. consummated an agreement with the Ruben H. Donnelly Company, a direct mail advertising agency, under the terms of which the latter contracted to insert a specific quantity of Strome, Inc. photo-processing mailer envelopes into its promotional mailing, at a charge of $12.00 per thousand inserts. Integral to that contract, Strome, Inc. was permitted to include an additional insert for the mailing at a substantially reduced rate of $6.00 per thousand. Anxious to benefit from the reduced rate for the second insert, but unable, itself, to provide a second insert, Strome, Inc. sought to sell that right to another advertiser.

John Mera, responding to Strome, Inc.'s newspaper advertisement, agreed to purchase the right to the second insert at $8.00 per thousand to promote the sale of costume jewelry. Mera was then referred by Strome, Inc. to Henry Wener of the Donnelly Company for further implementation of the mailing. Wener suggested that Mera contact Perlmuter Printing to print the flyers for the second insert. Mera did so, and, in mid-March, 1975 received Perlmuter's price quotation of $6.80 per thousand pieces. Mera, lacking the financial resources to support his proposed venture, then solicited, through Richard Perlmuter, the participation of Perlmuter Printing in the jewelry venture. Perlmuter, unwilling to assume the risk, declined participation in the proposed joint venture and insisted that at least a $70,000.00 advance was required to offset the cost of necessary printing materials.

Mera subsequently turned to Strome, Inc. for financing and, at a March 27 meeting attended by George Strome, president of Strome, Inc., Clifford Strome, vice president of Strome, Inc., Henry Wener and John Mera, a participation agreement evolved under the terms of which the Stromes and Mera would jointly engage in the costume jewelry venture. At the request of these parties, Wener contacted Richard Perlmuter on March 28, and stated that George Strome was willing to undertake the printing arrangement earlier sought by Mera. Perlmuter was then requested to meet with the parties at the offices of Strome, Inc. in New Jersey to discuss details of the agreement. In the course of the conversation with Wener and upon Perlmuter's inquiry, Wener further declared that Strome, Inc. held a solid credit rating.

Richard Perlmuter thereafter, on April 1, 1975, flew to Bergenfield, New Jersey for a meeting to discuss a printing contract. He arrived at the Strome, Inc. offices situated in the Strome, Inc. Building shortly before 11:00 a.m., and met Peter Vogel, house counsel for the firm, who introduced George Strome as president and Howard Strome as treasurer of Strome, Inc. Also present were Henry Wener, John Mera, and Clifford Strome. Discussions ensued concerning the printing of 17 million flyers for the costume jewelry venture. The artwork, consisting of a black and white copy, a 35 mm. color photo, and a tissue copy, were presented by Mera with the necessary printing instructions. Certain modifications were made on the copy to provide separate coding for four different mailings, changing the identifying caption and mailing address to "Tiger Color Presents" and "Strome Marketing, Inc.". George Strome, then requested Perlmuter to proceed with the printing, "as soon as possible".

Vogel directed that the first 250,000 flyers printed be shipped directly to Strome, Inc. for insertion into an independent Strome, Inc. mailing, which was separate from the Donnelly mailing. Perlmuter was impressed by the parties with the magnitude and urgency of the undertaking and recognized that immediate action was required to ensure completion of the 17 million pieces in time for the Donnelly mailing deadlines. He therefore assured the others that with around-the-clock perseverance, the first shipment of 250,000 flyers could be delivered by the April 7 deadline. The parties agreed to this timetable.

Discussions continued during luncheon, and, upon returning to the offices of Strome, Inc., Perlmuter requested a purchase order from Vogel. Vogel demurred,

stating that other matters of urgency required his immediate attention but he would forward to Perlmuter a purchase order within a day or so. Relying upon this assurance and upon the earlier discussions with the parties, Perlmuter departed George Strome's office that afternoon, confident that he had a binding contract with Strome, Inc. Before leaving New Jersey, he telephoned his paper supplier and placed an order for 100,000 pounds of paper to ensure the availability of materials when printing would commence.

Immediately subsequent to Perlmuter's departure, Peter Vogel, and George, Clifford and Howard Strome formed a new corporation, known as Strome Marketing, Inc. Later that afternoon, a Strome, Inc. secretary rushed the certificate of incorporation to Trenton, New Jersey, a distance of 93 miles, for filing with the Secretary of State. Subsequently, George Strome was appointed president of the new corporation, Clifford Strome, vice president, and Howard Strome, treasurer; the very same offices held by these men in Strome, Inc. Although the Stromes fully intended to form the new corporation from a time prior to the April 1 meeting, and further intended that such corporation would engage in the costume jewelry venture as a "bootstrap operation", no mention of these very material and contrary intentions was ever conveyed to Perlmuter. Nor was explanation made that any corporation or party other than Strome, Inc. was the real party in interest to the agreement to print the jewelry flyers.

Perlmuter, having returned to Cleveland, initiated a work order in the name of Strome, Inc. and prepared to commence printing on April 4. On April 3, Perlmuter requested a Dunn & Bradstreet report on the credit rating of Strome, Inc. The report, later received, proved favorable, and Perlmuter, relying upon these results, implemented performance under the contract. On Friday, April 4, Mera arrived at the printing plant to approve the final copy of the mailing insert. Having approved the copy, Mera executed, over his personal signature and on behalf of another corporate entity, Naturex, a separate purchase order for one million additional flyers. Thereafter, on that same day, Perlmuter telephoned Vogel, again requesting the purchase order manifesting the oral agreement. Vogel advised him that the purchase order had probably been lost in the mail and that another would be forwarded forthwith. Perlmuter thereupon printed the first 250,000 flyers and by April 8, delivered them to Strome, Inc.

Printing continued around the clock and by the tenth of April, 10,600,000 pieces, or 62% of the order, were completed. On that day, the long awaited purchase order arrived, directing that the first three shipments of 250,000 pieces each, be increased to 275,000 pieces each. Perlmuter telephoned Vogel and advised him that printing for the Donnelly mailing had already commenced and that the copy could no longer be changed. Vogel assured him that the 250,000 already delivered would be satisfactory. Perlmuter failed to attach any significance to the name "Strome Marketing, Inc." on the purchase order and, due to the similarity of the new corporate name to "Strome, Inc.", did not distinguish one corporation from the other. Later, when invoices were forwarded by the Perlmuter billing clerk, no significance was attached to or distinction drawn between Strome, Inc. and Strome Marketing, Inc.

When final shipment was completed, Perlmuter was not consciously aware of the existence of the two separate corporations. The final revelation manifested itself in October of 1975 when, upon the failure of the jewelry venture, and the refusal of either Strome, Inc. or Strome Marketing, Inc. to tender payment of the $124,240.37 purchase price to Perlmuter Printing, George Strome, for the first time informed Perlmuter that this had been a "boot-strap operation" and that he had assumed Perlmuter was aware of that fact.

Plaintiff brought this action asserting a binding oral contract on April 1, between Perlmuter Printing and Strome, Inc. Defendant challenges the existence of such

oral contract and asserts a written contract, evidenced by the purchase order of Strome Marketing, Inc.

The parties have stipulated the amount due to plaintiff, if defendant is found liable on the contract, to be $124,240.37.

■ Before treating upon the merits of the claim, the Court directs its attention to the issue of applicable state law. In a diversity action such as this, the Ohio conflict of laws determines which state law shall attach. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

■ Generally, issues concerning the execution, interpretation and validity of a contract are determined by the *lex loci contractus*, the law of the place where the contract was made. *Scudder v. Union National Bank*, 91 U.S. 406, 23 L.Ed. 245 (1875). The courts of Ohio adhere to this principle of *lex loci contractus*, in contradistinction to the principle of *lex loci solutionis*, which applies the law of the place of performance to issues of contract validity and interpretation. *Heaton v. Eldridge & Higgins*, 56 Ohio St. 87, 46 N.E. 638 (1897). This position is also reflected by the pronouncement of the Sixth Circuit Court of Appeals in *Sheerin v. Steele*, 240 F.2d 797 (6th Cir. 1957):

> [T]he validity and construction of a contract with respect to the rights and obligations created thereby are governed by the law of the place where the contract is made. *Id.* at 798–99.

*See also, Brocalsa Chemical Co. v. Langsenkamp*, 32 F.2d 725 (6th Cir. 1929).

■ Since the oral contract here in issue arose out of negotiations and discussions conducted in New Jersey, the issues of contract validity, interpretation and obligation, as to the asserted oral contract, are resolved by applying the law of the State of New Jersey, the *lex loci contractus*.

■ Confronting the issue of contract validity, the Court must first determine if the asserted oral contract is voidable by the written memorandum requirement of the statute of frauds. Pursuant to *Klaxon, su-pra*, the Court is directed to the Ohio conflict of laws to determine the applicable statute of frauds, i. e. that of Ohio or New Jersey. In Ohio, the statute of frauds is deemed to be procedural and remedial in nature, and the law of the forum, *lex fori*, controls. *Heaton v. Eldridge & Higgins, supra*. Accordingly, the Ohio statute of frauds must be applied to the oral contract asserted herein. This distinction, however, is not significantly material since both Ohio and New Jersey have adopted the Uniform Commercial Code and both states have substantially identical statutes of fraud.

Uniform Commercial Code (U.C.C.) § 2–201(1), Ohio Revised Code (O.R.C.) § 1302.-04(A), and New Jersey Statutes Annotated (N.J.S.A.) § 12A:2–201(1) provide, in pertinent part:

> Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker.

Plaintiff correctly excepts to the foregoing by asserting that no written memorandum is required on a contract for the sale of goods when the goods are to be specially manufactured, and to that end, identified to the contract:

> A contract which does not satisfy the requirements of division (A) of this section but which is valid in other respects is enforceable:
>
> (1) if the goods are to be specially manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller's business and the seller, before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer, has made either a substantial beginning of their manufacture or commitments for their procurement.

U.C.C. § 2–201(3), O.R.C. § 1302.04(C), N.J. S.A. § 12A:2–201(3).

■ It is beyond dispute that the flyers printed herein, were especially adapted to defendant's specific requirements pursuant to the April 1 agreement. Moreover, even if the purchase order of Strome Marketing, Inc., received by Perlmuter Printing on April 10, is construed as a repudiation of any contract with Strome, Inc., Perlmuter had, by that late date completed more than a "substantial beginning" by printing 62% of the 17 million flyers ordered.

Furthermore, the oral agreement of April 1, is the subject of a second exception, pursuant to O.R.C. § 1335.05, which also takes the contract outside the statute of frauds thereby obviating a written memorandum. Section 1335.05, O.R.C. provides in pertinent part:

No action shall be brought whereby to charge the defendant . . . upon an agreement that is not to be performed within one year from the making thereof; unless the agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or some other person thereunto by him or her lawfully authorized.

The New Jersey statute is substantially the same. *See,* N.J.S.A. § 25:1–5.

The Ohio courts have interpreted this statutory provision as follows:

A parol contract susceptible of being performed within a year and not containing a provision setting the time of performance beyond a year is not within the statute. And this is so even though such contract is not likely to be performed within a year.

*Robnolte v. Kohart,* 81 Ohio App. 1, 76 N.E.2d 913, 915 (1947). *See also, Burns Bros. Plumbers, Inc. v. Groves Ventures Co.,* 412 F.2d 202 (6th Cir. 1969).

As the evidence elicited at trial has disclosed, the printing contract in issue was to have been completed, and was in fact completed, within a matter of a few weeks. Since the contract was performed within a year, the statute of frauds does not apply and the oral agreement of April 1 did not require a written memorandum.

■ A contract is generally defined as a promise, or set of promises, actionable upon breach. Essential elements of a contract include an offer, acceptance, contractual capacity, consideration, (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration. 1 *Williston on Contracts* § 18 (3d ed. 1957). *See Cohn v. Fisher,* 118 N.J.Super. 286, 287 A.2d 222 (1972).

■ Uniform Commercial Code § 2–204, N.J.S.A. § 12A:2–204, O.R.C. § 1302.07, provides:

(1) A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.

(2) An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined.

(3) Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.

The evidence elicited at trial proves the existence of a valid and binding oral contract resulting from the April 1 meeting. The conduct of the parties manifested their agreement that Perlmuter would print 17 million flyers for the mail order sale of jewelry. The essential contract terms of quantity, price, date and place of delivery, were determined at the April 1 meeting. The contract was sufficiently definite, notwithstanding the provision of U.C.C. § 2–204(3). Certainly, George Strome's direction to Richard Perlmuter to begin printing "as soon as possible" manifested words and conduct sufficient to constitute a binding oral contract.

■ Defendant contends, however, that there was no mutuality of assent since

George Strome had intended to execute the contract on behalf of Strome Marketing, Inc., not on behalf of Strome, Inc. In support of its contention, defendant relies upon the Peerless case on mutual mistake of fact, *Raffles v. Wichelhaus*, 159 Eng.Rep. 375 (Ex.1864). The Court finds inapposite defendant's reliance thereon.

> Under the objective theory of mutual assent followed in all jurisdictions, a contracting party is bound by the apparent intention he outwardly manifests to the other contracting party. To the extent that his real, secret intention differs therefrom, it is entirely immaterial.

*Cohn v. Fisher, supra* at 291, 287 A.2d at 225. The Court is not confronted here by a mere mistake of fact resulting from some ambiguity in the terms of a contract. Rather, the Court perceives a misunderstanding, bordering upon intentional calculated misrepresentation, as to the representative capacity of the contracting parties, and under the objective theory of mutual assent, Strome, Inc. is bound by the April 1 oral contract.

It is generally considered that "a corporation can act only through its agents and, like a natural person, is bound only by the acts of an agent done within the scope of his authority". *Budelman v. Whites Express & Transfer Co., Inc.*, 49 N.J.Super. 511, 521, 140 A.2d 552, 556 (1958). The president of a corporation is one such agent.

> [I]t is normal for the president of a corporation to act as its chief executive officer and agent, and contracts made by a corporation's authorized agent within the scope of its legitimate purposes are binding on it.

*Gardner v. The Calvert*, 253 F.2d 395, 398 (3d Cir.), *cert. denied*, 356 U.S. 960, 78 S.Ct. 997, 2 L.Ed.2d 1067 (1958).

The Supreme Court of New Jersey has determined that corporate officers are authorized to bind the corporation where such power is express, implied or apparent.

> It is settled that a corporation is bound by the act of an officer or agent to the extent the power to do the act has been conferred upon him: (1) expressly (a) by the corporate charter, (b) by the by-laws of the corporation, or (c) by the corporate action of the stockholders or board of directors; (2) by implication (a) from powers expressly conferred or (b) incidental thereto; or (3) where the act is within the apparent powers which the corporation has caused those with whom its officers or agents have dealt to believe it has conferred upon them.

*C. B. Snyder Realty Co. v. National Newark & Essex Banking Co. of Newark*, 14 N.J. 146, 154, 101 A.2d 544, 548 (1953).

Further defining the character of a corporate officer's *apparent* authority, the New Jersey Court of Errors and Appeals stated:

> [T]he general rule, applicable here, is that a corporation is bound by the acts of its agents within the apparent authority which it knowingly permits the agent to assume, or which it holds the agent out to the public as possessing. The question in every such case depending upon the apparent authority of the agent is whether the corporation has, by its voluntary act placed the agent in such a situation that a person of ordinary prudence, conversant with business usages and the nature of the particular business, is justified in presuming that such agent was authorized to perform the particular act in question.

*Augustine v. Haas*, 121 N.J.L. 58, 64, 1 A.2d 387 (1938).

Richard Perlmuter was first exposed to defendant Strome, Inc. through his prior dealing with its house counsel, Peter Vogel. When he learned from Henry Wener that George Strome, of Strome, Inc., desired to engage Perlmuter Printing to print the jewelry flyers, he rightfully assumed, based upon those prior dealings, without indication to the contrary that Strome, Inc. was the contracting party. On April 1, Perlmuter traveled to the offices of Strome, Inc. situated in the Strome, Inc. Building identified as such by several signs. Upon his arrival, he met Peter Vogel, whom he knew to be house counsel for Strome, Inc., and toured the plant and facilities of Strome, Inc. He was thereafter introduced to

**416**

George, Clifford and Howard Strome, as president, vice president and treasurer of Strome, Inc., (the three of whom owned 86% of the outstanding shares of Strome, Inc. and who were also three of the four directors of Strome, Inc.). Finally, these officers engaged in contract negotiations with Richard Perlmuter, in the private office of the president of Strome, Inc.

█ It is apparent that the Strome brothers, as officers, directors and shareholders, and particularly the president, George Strome, were empowered and authorized to enter into such a contract and to bind Strome, Inc. thereto, whether such power was expressly or apparently conferred. Clearly, the contract negotiations had every outward manifestation of an anticipated venture of Strome, Inc. The setting, the individual characters and the dialogue appear to have been orchestrated to create that very impression. Clearly, Richard Perlmuter anticipated and intended to contract with no corporation other than Strome, Inc. To assert now, that George Strome was acting on behalf of Strome Marketing, Inc., belies the apparent authority and intent manifested by the conduct of all the Strome brothers and their associates, employees and representatives on April 1.

Defendant Strome, Inc. is, furthermore, estopped to deny the existence and validity of a binding oral contract with Perlmuter Printing. The essential elements of equitable estoppel are apparent from the pronouncements of *Feldman v. Urban Commercial, Inc.*, 70 N.J.Super. 463, 175 A.2d 683 (1961):

> (1) [T]here must be conduct—acts, language, or silence—amounting to a representation or a concealment of material facts; (2) these facts must be known to the party estopped at the time of his said conduct, or at least the circumstances must be such that knowledge of them is necessarily imputed to him; (3) the truth concerning these facts must be unknown to the other party claiming the benefit of the estoppel, at the time when such conduct was done, *and at the time it was acted upon by him* ; (4) the conduct must

be done with the intention, or at least with the expectation, that it will be acted upon by the other party, or under the circumstances that it is both natural and probable that it will be so acted upon; (5) *the conduct must be relied upon by the other party*, and, thus relying, he must be led to act upon it; (6) he must in fact act upon it in such manner as to change his position for the worse, in other words, he must so act that he would suffer a loss if he were compelled to surrender or forego or alter what he has done by reason of the first party's being permitted to repudiate his conduct and assert, rights inconsistent with it. *Id.* at 474–475, 175 A.2d at 688–689.

Upon thorough review of the evidence presented at trial, the Court concludes that each of the above requirements of the doctrine of equitable estoppel is present.

In examining the evidence supporting this conclusion, the Court directed particular attention to the conduct which necessarily summons forth the doctrine of equitable estoppel.

> Equitable estoppel in the modern sense arises from the *conduct* of a party, using the word in its broadest meaning as including his spoken or written words, his positive acts, and his silence or negative omission to do anything. Its foundation is justice and good conscience. . . .
> 3 Pomeroy on Equity Jurisprudence (5th ed. 1941). Section 802.

*State v. United States Steel Corporation*, 22 N.J. 341, 358, 126 A.2d 168, 177 (1956). The doctrine "is grounded not on subjective intent but rather on the objective impression created by the actor's conduct". *Dambro v. Union County Park Commission,* 130 N.J. Super. 450, 457, 327 A.2d 466, ·470 (1974), citing to *Matsuo Yoshida v. Liberty Mutual Insurance Company*, 240 F.2d 824, 830 (9th Cir. 1957).

While defendant asserts that George Strome was, on April 1, acting on behalf of Strome Marketing, Inc., the evidence clearly discloses that no such corporation existed at the time the oral contract was made. George Strome could not have contracted

on behalf of a non-existent party, and was duty-bound to inform Perlmuter that he was not representing Strome, Inc. in forming the contract. To do otherwise was to mislead Richard Perlmuter.

Considering all the facts and circumstances surrounding the April 1 meeting, including the physical surroundings of the place of contracting; the conduct of the Strome brothers and Peter Vogel; the fact that Strome Marketing, Inc., did not then exist; the fact that no attempt was made or even contemplated by the Stromes or Vogel to inform Perlmuter of the future formation of a new corporation; a person of ordinary prudence, such as Richard Perlmuter, could reasonably presume that Strome, Inc. was the acting party to the April 1 oral contract and could justifiably rely upon that presumption in performing under the contract. The foregoing circumstances have all the appearances of a design calculated to mislead Richard Perlmuter into the illusory assumption that he was, in fact, dealing with Strome, Inc. As a consequence, Strome, Inc. is now estopped to deny the April 1 oral contract and its obligation thereunder.

Finally, defendant asserts that even if Richard Perlmuter was not aware that the jewelry venture was to be a "bootstrap operation" conducted in the name of Strome Marketing, Inc., Henry Wener, who had in the past received a finder's fee from Perlmuter Printing for referring printing business to Perlmuter, *was* aware of the intent of the Stromes, and that his knowledge was imputed to Perlmuter Printing by reason of an agent/principal relationship that arose out of that finder's fee arrangement. Upon review of the evidence, the Court finds no agent/principal relationship between Wener and Perlmuter, and does not impute Wener's knowledge to Perlmuter.

Even assuming, arguendo, that Wener was an agent of Perlmuter, he was no more than a special agent, who served Perlmuter only by referring potential customers to Perlmuter Printing. Having done so, his special agency terminated.

Knowledge he may have acquired subsequent to such referral was not, therefore, imputed to Perlmuter. Moreover, Wener was not a party to the contract negotiations between Strome and Perlmuter. Nor was Wener authorized by Perlmuter to conduct any transaction or negotiate any contract on behalf of Perlmuter Printing. Consequently, his knowledge cannot be imputed to Perlmuter. *See,* Restatement (Second) of Agency § 268(1)(c) (1958). Wener's primary involvement in this matter arose from his employment with the Ruben H. Donnelly Company, and it was he who negotiated the mailing contract with Strome, Inc. on behalf of Donnelly. Therefore, Wener's knowledge of the "bootstrap" nature of the jewelry venture, or of Strome's intent to represent Strome Marketing, Inc., is not imputed to Perlmuter. Finally, Wener was never summoned as a witness in this case and, in the absence of his testimony, the Court cannot speculate as to his knowledge or understanding of Strome's intent.

Accordingly, the Court, upon thorough review of the pleadings, the trial testimony and exhibits, and the arguments of counsel, recognizes the existence of a binding oral contract formed on April 1 between the Perlmuter Printing Company and Strome, Inc., and IT IS ORDERED that Judgment be, and the same is, hereby entered in favor of plaintiff Perlmuter Printing Company, and against defendant Strome, Inc. in the stipulated amount of $124,240.37, together with the costs of this action.

IT IS SO ORDERED.