[Cite as *Link v. Kelly*, 2025-Ohio-711.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## LOGAN COUNTY

DAVE LINK,

    PLAINTIFF-APPELLANT,

  v.

CLIFFORD E. KELLY,

    DEFENDANT-APPELLEE.

CASE NO. 8-24-16

O P I N I O N

---

**Appeal from Logan County Common Pleas Court**
**General Division**
**Trial Court No. CV 21 11 0248**

**Judgment Reversed and Cause Remanded**

**Date of Decision: March 3, 2025**

---

**APPEARANCES:**

    *Stanley R. Evans* **for Appellant**

    *Terrence G. Stolly* **for Appellee**

**WALDICK, P.J.**

{¶1} Plaintiff-appellant, Dave Link ("Link"), appeals the judgment granted in favor of defendant-appellee, Clifford Kelly ("Kelly"), in the Logan County Court of Common Pleas, following a trial to the court on Link's complaint seeking specific performance and monetary damages related to a contract for the purchase of real property owned by Kelly.

*Procedural History*

{¶2} This case originated on November 22, 2021, when Link filed a complaint against Kelly in the trial court, alleging that on September 3, 2021, Link and Kelly had entered into a binding written contract pursuant to which Kelly was obligated to sell approximately 120 acres of farm land to Link for $988,650.00. The complaint alleged that the parties had agreed to a closing date of no later than October 8, 2021, but that Kelly had refused to close the transaction as required by the contract. The complaint alleged that Link was ready, willing, and able to perform his remaining obligations under the contract and that he had performed all other conditions precedent required of him by the contract, but that Kelly refused to accept Link's tender of the purchase price and convey the real property to Link. The complaint sought specific performance of the contract, specifically an order requiring Kelly to sell and convey the real estate at issue. The complaint also sought monetary damages for financial loss alleged to have been incurred by Link as a result of Kelly's alleged breach of contract.

{¶3} On January 12, 2022, Kelly filed an answer to the complaint, in which the bulk of the allegations in the complaint were denied or not addressed, although Kelly admitted that he would not close the transaction.

{¶4} On February 28, 2022, Link filed a motion to enforce settlement, which Kelly opposed on March 8, 2022. On May 3, 2022, the trial court held an evidentiary hearing on Link's motion. On May 11, 2022, the trial court filed a judgment entry denying the motion to enforce settlement.

{¶5} On September 2, 2022, Kelly filed a motion for leave to file a third-party complaint against Oakridge Realty and Auction Company and Kevin Miller, which the trial court granted by judgment entry filed on November 22, 2022. On December 1, 2022, Kelly filed a third-party complaint against Oakridge and Miller. On December 12, 2022, Oakridge and Miller filed their answer and a counterclaim against Kelly.

{¶6} On September 18, 2023, Link filed a motion for partial summary judgment, requesting that summary judgment be granted in his favor on the claim for specific performance. On October 16, 2023, Kelly filed a memorandum in opposition to Link's motion for summary judgment. On November 16, 2023, the trial court filed a judgment entry overruling Link's motion for summary judgment.

{¶7} On December 13, 2023, a trial to the court was held. On that same date, Link and Kelly filed a set of joint stipulations of fact with the trial court.

**{¶8}** On February 5, 2024, the trial court filed a judgment entry in which the court made findings of facts and conclusions of law, and entered judgment in favor of Kelly.

**{¶9}** On February 29, 2024, Kelly and the third-party defendants filed a joint stipulation of dismissal of their respective claims against each other.

**{¶10}** On March 1, 2024, the trial court filed an entry of final judgment.

**{¶11}** On March 28, 2024, Kelly filed the instant appeal, in which he raises nine assignments of error for our review.

### First Assignment of Error

**The trial court erred in denying appellant's motion to enforce settlement agreement.**

### Second Assignment of Error

**The trial court erred in denying appellant's motion for summary judgment.**

### Third Assignment of Error

**The trial court abused its discretion by considering materials not introduced at trial.**

### Fourth Assignment of Error

**The trial court erred by concluding that appellant implicitly consented to try the defense of impossibility.**

### Fifth Assignment of Error

**The trial court abused its discretion in raising and considering the improperly pled defense of mutual mistake.**

**Sixth Assignment of Error**

**The trial court abused its discretion in raising for and on behalf of appellee the unpled affirmative defenses of denial of the performance and occurrence of conditions precedent.**

**Seventh Assignment of Error**

**The trial court erred as a matter of law in concluding that the sale of the 120.567 acres resulting in the creation of the landlocked parcels constitutes mutual mistake.**

**Eighth Assignment of Error**

**The trial court erred as a matter of law by not allocating the risk of mutual mistake against appellee.**

**Ninth Assignment of Error**

**The trial court erred in concluding that specific performance would be excessively oppressive.**

*First Assignment of Error*

{¶12} In the first assignment of error, Link asserts that the trial court erred in overruling his motion to enforce a settlement agreement.

{¶13} As previously noted, Link filed the complaint against Kelly on November 22, 2021. Approximately three months later, on February 28, 2022, Link filed a motion to enforce settlement. In that motion, Link contended that, through his attorney, he had entered into a binding settlement agreement with Kelly, through Kelly's attorney, and that Kelly was attempting to rescind that settlement agreement that would have resolved the lawsuit. On March 8, 2022, Kelly filed a memorandum in opposition to the motion to enforce settlement, arguing that no binding settlement

agreement existed because there had been no definite offer regarding settlement and no acceptance thereof. Kelly also asserted that he never gave authorization to his prior counsel to enter into any settlement agreement.

{¶14} On May 3, 2022, the trial court held an evidentiary hearing on Link's motion to enforce settlement. On May 11, 2022, the trial court filed a judgment entry denying Link's motion, finding for several reasons that the parties had not entered into an enforceable settlement agreement.

{¶15} A settlement agreement is a contract designed to terminate a claim by preventing or ending litigation. *Continental W. Condominium Unit Owners Assn. v. Howard E. Ferguson, Inc.*, 74 Ohio St.3d 501, 502 (1996). As with any other contract, a settlement agreement requires an offer, acceptance, consideration, and mutual assent between two or more parties with the legal capacity to act. *See, e.g., Kostelnik v. Helper*, 2002-Ohio-2985, ¶ 16; *Rulli v. Fan Co.*, 79 Ohio St.3d 374, 376 (1997).

{¶16} For a settlement agreement to be enforceable, there must be a "meeting of the minds" as to the essential terms of the agreement. *Kostelnik*, at ¶ 16. The essential terms of the agreement must be "reasonably certain and clear." *Kostelnik*, at ¶ 17. It is preferable that settlement agreements be memorialized in writing. *Kostelnik*, at ¶ 15. However, an oral settlement agreement is enforceable if there is sufficient particularity to form a binding contract. *See, e.g., Spercel v. Sterling Industries, Inc.*, 31 Ohio St.2d 36, 39 (1972). "Terms of an oral contract may be

determined from 'words, deeds, acts, and silence of the parties.'" *Kostelnik*, *supra*, at ¶ 15, quoting *Rutledge v. Hoffman*, 81 Ohio App. 85, paragraph one of the syllabus (1947).

{¶17} "Because a settlement agreement constitutes a binding contract, a trial court has authority to enforce the agreement in a pending lawsuit." *Infinite Sec. Solutions, L.L.C. v. Karam Properties, II, Ltd.*, 2015-Ohio-1101, ¶ 16. However, when the existence of a settlement agreement is in dispute, the trial court must conduct an evidentiary hearing prior to entering a judgment with regard to the agreement. *Rulli v. Fan Co.*, *supra*, at syllabus.

{¶18} In *Continental W. Condominium Unit Owners Assn. v. Howard E. Ferguson, Inc.*, *supra*, the Supreme Court of Ohio addressed the standard of review to be applied to rulings on a motion to enforce a settlement agreement. In that case, the court of appeals had applied an abuse of discretion standard, which the Ohio Supreme Court found to be erroneous. *Id.*, at 502. The Supreme Court of Ohio held that, "because the issue is a question of contract law, Ohio appellate courts must determine whether the trial court's order is based on an erroneous standard or a misconstruction of the law." *Id.* Thus, "[t]he standard of review is whether or not the trial court erred." *Id.*, citing *Mack v. Polson Rubber Co.*, 14 Ohio St.3d 34 (1984) and *Spercel v. Sterling Industries*, 31 Ohio St.2d 36 (1972). "Accordingly, the question before us is whether the trial court erred as a matter of law in dismissing the motion to enforce the settlement agreement." *Id.*

**{¶19}** However, following the decision of the Supreme Court of Ohio in *Continental W. Condominium Unit Owners Assn.*, it has also been frequently noted by Ohio courts that "appellate review of a decision on the existence of a contract raises a 'mixed question of fact and law.'" *B.W. Rogers Co. v. Wells Bros., Inc.*, 2012-Ohio-750, ¶ 29 (3d Dist.), quoting *Hickman v. Cole,* 1999 WL 254379 (3d Dist. Apr. 7, 1999). Accordingly, "'[w]e accept the facts found by the trial court on some competent, credible evidence, but freely review application of the law to the facts.'" *B.W. Rogers Co.*, *supra*, at ¶ 29, quoting *Cramer v. Bucher*, 2022-Ohio-3397, ¶ 9 (3d Dist.). "'A reviewing court should be guided by a presumption that the findings of a trial court are correct, since the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use their observations in weighing credibility of the proffered testimony.'" *Id*.

**{¶20}** In the instant case, Link's motion to enforce settlement was denied by the trial court on multiple grounds. First, the trial court found that Link had failed to establish that Kelly's prior legal counsel had authority to enter into a binding settlement agreement on Kelly's behalf. The trial court further found that the testimony established that Kelly's counsel did not intend to be bound until an agreement was formalized in writing. Finally, the trial court found that a meeting of the minds had not been reached on the settlement agreement due to the fact that a closing date had not been agreed upon and, further, because the parties had not reached an agreement on the allocation of court costs.

**{¶21}** On appeal, we first consider the trial court's determination regarding the authority, or lack thereof, of Kelly's attorney to settle the case.

**{¶22}** As this Court noted in *Jackson v. Kelly*, 1995 WL 442496 (3d Dist. July 26, 1995), it is well established that "'[a]bsent specific authorization, an attorney has no implied or apparent authority, merely by virtue of a general retainer, to compromise and settle his client's claims, nor can a court compel settlement or by its *imprimatur* validate a settlement which is otherwise unenforceable.'" *Id*., at *2, quoting *Klever v. Stow*, 13 Ohio App.3d 1, syllabus (1983). "An attorney's authority to settle however, need not be express as it may be ascertained from the circumstances of the situation." *Id*., citing *Elliott v. General Motors Corp*., 72 Ohio App.3d 486 (1991).

**{¶23}** "If a client authorizes its attorney to negotiate a settlement and the attorney negotiates a settlement within the scope of that authority, the client is bound by it." *Zele v. Ohio Bell Telephone Co.*, 2023-Ohio-2875, ¶ 37 (8th Dist.), citing *Bromley v. Seme*, 2013-Ohio-4751, ¶ 25 (11th Dist). "However, whether a party authorized his or her attorney to settle a case on certain terms is generally a question of fact." *Zele*, at ¶ 37, citing *Schalmo Builders, Inc. v. Zama*, 2008-Ohio-5879, ¶ 17 (8th Dist.); *PNC Mtge. V. Guenther*, 2013-Ohio-3044, ¶ 12 (2nd Dist.).

**{¶24}** In the instant case, the record reflects the following evidence was introduced at the May 3, 2022 hearing on Link's motion to enforce settlement.

{¶25} Prior to being sued, but after being notified via a letter from Link's counsel as to the potential of a lawsuit, Kelly retained attorney Daniel Bey to represent him. At the May 3, 2022 hearing, Bey testified that he began representing Kelly and his wife in the case on November 1, 2021, which was the day he first met with them, and that his representation continued until he was terminated in mid-February of 2022.

{¶26} Bey testified that, at his November 1, 2021 meeting with Kelly and his wife, it was discussed that there was a purchase agreement for land that appeared to have been signed by Kelly, but the Kellys indicated they were not going to finalize the sale. Accordingly, at that initial meeting, Bey discussed the potential of a lawsuit for specific performance with the Kellys. Bey testified that he also discussed with the Kelleys the potential ways to resolve the threatened litigation.

{¶27} On November 22, 2021, Link's complaint was filed by attorneys Stanley Evans and Robert Fitzgerald. Bey testified that, as a result of the complaint having been filed, he had another meeting with the Kellys on December 1, 2021. Mrs. Kelly's son-in-law, Gil Weithman, accompanied the Kellys to that meeting. Bey testified that his understanding was that Weithman, an attorney and a municipal court judge in Champaign County, was present as a facilitator for the Kellys because he was the lawyer in the family. However, Bey also testified that the Kellys would be the persons to ask why Weithman was at that meeting. Bey testified that, at the December 1st meeting, after discussing some potential defenses

to the pending lawsuit with the Kellys and Weithman, it was decided that an answer should be filed and an appraisal done of the real property at issue.

{¶28} On January 12, 2022, Bey filed an answer to the complaint on Kelly's behalf. The appraisal was also completed, which reflected that the land was worth $144,000.00 less, or over a thousand dollars per acre less, than Link had agreed to pay for it. Bey testified that, after the appraisal came back on January 13, 2022, he had another meeting at his office with the Kellys and Weithman on January 25, 2022. Also present at the January 25th meeting was Dina Cary, an attorney associated with Bey's law firm.

{¶29} Bey testified that, at the January 25th meeting, after discussing the case and the merits of any potential defenses, he recommended to the Kellys that they should seek to settle the matter upon the original terms of the purchase agreement. Bey testified that Weithman also thought that Bey's settlement recommendation was the proper course. Bey testified that the Kellys said that they wanted to think about that recommendation and that they would then get back to Bey. Bey testified that, following the January 25th meeting, he received a voicemail message from Weithman indicating that the Kellys had discussed it and they wanted to proceed to settle the matter as had been discussed at the meeting.

{¶30} Bey acknowledged in his testimony that he then initiated a telephone call to Link's attorney Robert Fitzgerald on February 1, 2022. Bey told Fitzgerald that the defense wanted to discuss settlement of the matter. Bey testified that he and

Fitzgerald then discussed settling the matter based on the terms of the purchase agreement. Bey testified that, while he could not recall if Fitzgerald agreed at that time or called back later, Fitzgerald agreed to settle based upon the original terms of the purchase agreement.

**{¶31}** Bey testified that he had made an offer of settlement and that, in his opinion, Fitzgerald had accepted the offer to settle the case. Bey also identified a letter that he subsequently received from Fitzgerald, dated February 2, 2022, which read in its entirety:

> This is to confirm our conversation that took place on Tuesday, February 1, 2022. In that telephone conversation you advised that your client has authorized you to resolve this case by agreeing to proceed with the sale and closing of this real estate transaction.
>
> As you know, I requested a specific closing date. However, you declined for the reasons that you believe the title work will need to be concluded before a final closing date could be selected. Based upon the fact that Mr. Kelly is going to proceed with the sale, I will take no further action on this case at this time. Mr. Evans is my co-counsel and I am requesting that you contact him to finalize the sale and establish the closing date.
>
> Finally, by way of copy of this letter, I am advising Mr. Evans and our client, Mr. Link, that Mr. Kelly intends to go through with the sale.
>
> If I have misstated the agreement, please contact me immediately. Otherwise, on behalf of Mr. Evans and our client, I want to thank you.
>
> In the meantime, please find enclosed a copy of the Motion and proposed Judgment Entry for Continuance of the telephonic scheduling conference scheduled for March 7, 2022.

{¶32} Bey testified that, after receiving that letter from Fitzgerald, he had no further correspondence with Fitzgerald. When asked specifically if he had the authority to enter into that settlement agreement, Bey testified, "yes." (5/3/22 Tr., 42).

{¶33} Bey further testified that, at no time after February 2, 2022, did he ever revoke the settlement agreement on behalf of the Kellys. Bey testified that he was then terminated as counsel by the Kellys in mid-February of 2022, which would have terminated his authority to act on their behalf at that time.

{¶34} On cross-examination, Bey acknowledged that he had an appointment scheduled with the Kellys on February 17, 2022, and the purpose of that meeting, which was never held, was to review some revisions requested by Evans to the written settlement agreement that Bey's office had drafted. Bey testified that no written settlement agreement was ever signed by either of the Kellys. Bey was also read an exhibit purporting to transcribe the voicemail he had received from Weithman. Bey confirmed that the following was an accurate representation of the contents of that voicemail:

> Daniel, this is Skip Weithman. I'm calling about Clifford Kelly. We looked that over and he wants to see if you can get the thing settled. If you have any questions, give me a call. My number here is [omitted]. Thank you.

{¶35} Bey testified that the meeting with the Kellys scheduled for February 17, 2022 was not held because his representation was terminated earlier that same

day.  When then asked on cross-examination, "So there never was a final settlement agreement reached, right?", Bey answered, "So we did not have a final written settlement agreement." (5/3/22 Tr., 56).

{¶36} On re-direct examination, Bey acknowledged that he was not asked by Fitzgerald to prepare a written settlement agreement but that he did draft one after receiving the letter from Fitzgerald, which was forwarded onto Evans for his review.  Bey testified that Evans wanted revisions made to the written settlement agreement prepared by Bey.  One of those revisions related to court costs, which were approximately $63.00 at that time.  The other revision concerned language that Bey had, on his own accord, included in the written settlement agreement stating that the land would be transferred "as is", which Evans requested be modified to state that the land was substantially in the same condition as it was when the purchase agreement was signed.

{¶37} Bey's legal associate, Dina Cary, also testified at the May 3, 2022 hearing.  Cary testified that she was Bey's co-counsel on the case and was present at the January 25, 2022 meeting with Bey, the Kellys, and Weithman.  Cary testified that, at the meeting, they discussed with the Kellys various theories of defense, counsel's opinion as to the strengths or weaknesses of possible defenses, and whether they should move forward with defending the litigation or should settle the case. Cary testified that the terms of settlement discussed at the meeting were to settle pursuant to the terms contained in the original purchase agreement for the real

estate. Cary testified that the Kellys and Weithman said they wanted to think about some considerations that did not involve legal decisions, and that they would let counsel know what the decision was on moving forward. When asked if the Kellys or anyone on their behalf ever informed counsel how to proceed, Cary testified that Bey received a voicemail from Weithman a week or so after the meeting, saying to move forward with attempting to settle the case on the terms of the original contract. As a result, Bey and Cary spoke, and Cary drafted a written settlement agreement.

{¶38} While on the witness stand, Cary was shown the February 2, 2022 letter from Fitzgerald to Bey, and Cary confirmed that the terms set forth in the letter were the terms upon which the case was going to be settled. Cary testified that, as lead counsel for the Kellys, Bey had authority to act on behalf of the Kellys and, in particular, had authority to contact Fitzgerald's office on February 1, 2022, when the offer of settlement was extended to Fitzgerald.

{¶39} When asked about the written settlement agreement that she subsequently drafted, Cary testified that the original real estate contract was going to form the basis for the settlement agreement but there was going to be a written settlement agreement, because she would never settle litigation without a written settlement agreement. Cary testified that the "as is" language was included in that written agreement she drafted but acknowledged that there was no such language in the September 3, 2021 purchase agreement signed by Link and Kelly, upon which

the settlement was to be based. Cary also confirmed that the outstanding court costs in the case as of February of 2022 were $62.15, and that the sale price to be paid pursuant to the settlement, as in the original contract, was approximately $988,000.00. When asked again if Bey had authority to settle the lawsuit on February 1, 2022, without any equivocation, Cary answered, "Yes." (5/3/22 Tr., 82).

{¶40} On cross-examination, Cary testified that the purpose of the February 17, 2022 meeting with the Kellys, which was not held, was to review the terms relating to court costs and the condition of the premises, in order to see if the Kellys would agree to those things. Cary testified that the Kellys never "signed off on" the settlement agreement as a whole. (5/3/22 Tr., 84).

{¶41} On redirect-examination, Cary was asked, "when you were on the phone on February 1st, 2022, was there any doubt in your mind that this lawsuit was settled?", to which she answered, "No, I believed it was settling." (5/3/22 Tr., 87).

{¶42} On recross-examination, Cary acknowledged that she believed that the settlement was "subject to the typical dotting of the I's and crossing of T's and the signing of an agreement by the Kellys", which they never did. (5/3/22 Tr., 88).

{¶43} Kelly's wife, Mary Jane Kelly ("Mrs. Kelly"), also testified at the May 3, 2022 hearing, called as a witness on her husband's behalf. Mrs. Kelly testified that she and her husband, Clifford, have been married for 34 years, and that both of them have adult children from prior marriages. Mrs. Kelly testified that her

husband's son, Jim, is a part-time farmer and raised a stink when he learned that his father had signed a contract to sell the farm land. When asked if she had ever agreed to sign off on a settlement agreement regarding the litigation, she answered, "I haven't signed anything." (5/3/22 Tr., 102).

{¶44} On cross-examination, Mrs. Kelly testified that she and her husband had met with Bey at his office more than once, and that "Skip" Weithman, her son-in-law and an Urbana attorney, came with them after the first couple of times because they were concerned about selling the farm and Weithman was there to back them up, to listen and to help them, because he is their son-in-law. Mrs. Kelly testified that her family had hired Bey to represent them in the lawsuit and that Bey was authorized to act on her husband's behalf. Mrs. Kelly was then asked, "[i]f Mr. Bey said he had authority on February 1st of 2022 to settle this lawsuit based upon the conclusion of the sale, was he lying?", she answered, "No. I suppose." (5/3/22 Tr., 115).

{¶45} Following our review of the transcript of the May 3, 2022 hearing, we conclude that the record contains sufficient evidence to support the trial court's factual determination that it was not established that Attorney Bey had authority from his client, Kelly, to settle the lawsuit.

{¶46} Specifically, while both Bey and Cary testified that Bey had authority to settle the lawsuit, the evidence reflected that Bey's "authority" was based strictly on a voicemail left by Mrs. Kelly's son-in-law, Weithman. There was no evidence

-17-

presented that Kelly himself ever conveyed settlement authority to Bey, or that Kelly had authorized Weithman to act on his behalf in communicating with Bey about any potential settlement. Rather, the evidence reflected that, following the meeting on January 25, 2022, Kelly had expressed a desire to think about Bey's suggestion that the case be settled, and Bey then never heard anything back from Kelly.

**{¶47}** On the basis of the record before us, we conclude that there is some competent and credible evidence supporting the trial court's finding that Bey's authority to settle the case was not established at the hearing on the motion to enforce settlement. Accordingly, we defer to the trial court's determination on that factual issue and, on that basis, we affirm the trial court's decision on the motion to enforce settlement.

**{¶48}** The first assignment of error is overruled.

*Second Assignment of Error*

**{¶49}** In the second assignment of error, Link asserts that the trial court erred in denying his motion for partial summary judgment.

Civ.R. 56(A) provides, in relevant part:

A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part of the claim, counterclaim, cross-claim, or declaratory judgment action. * * *

Civ.R. 56(C) provides, in relevant part:

-18-

> * * * Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. No evidence or stipulation may be considered except as stated in this rule. A summary judgment shall not be rendered unless it appears from the evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

{¶50} "Pursuant to Civ.R. 56(C), summary judgment is appropriate only under the following circumstances: (1) no genuine issue of material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion, that conclusion being adverse to the nonmoving party." *Tharp v. Whirlpool Corp.*, 2018-Ohio-1344, ¶ 24 (3d Dist.), citing *Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64, 66 (1978).

{¶51} "The party moving for summary judgment has the initial burden of producing some evidence which demonstrates the lack of a genuine issue of material fact." *Ineos USA L.L.C. v. Furmanite America, Inc.*, 2014-Ohio-4996, ¶ 18 (3d Dist.), citing *Dresher v. Burt,* 75 Ohio St.3d 280, 292 (1996). "In doing so, the moving party is not required to produce any affirmative evidence, but must identify those portions of the record which affirmatively support his argument." *Id.* "The

nonmoving party must then rebut with specific facts showing the existence of a genuine triable issue; the nonmoving party may not rest on the mere allegations or denials of the pleadings." *Id.*, citing *Dresher* at 293; Civ.R. 56(E).

**{¶52}** "Material facts" are facts "that might affect the outcome of the suit under the governing law." *Turner v. Turner*, 67 Ohio St.3d 337, 340 (1993) citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986). "Whether a genuine issue exists is answered by the following inquiry: Does the evidence present 'a sufficient disagreement to require submission to a jury' or is it 'so one-sided that one party must prevail as a matter of law[?]'" *Id.*, quoting *Anderson*, 477 U.S. at 251-252.

**{¶53}** Appellate courts conduct a de novo review of a trial court's decision on a motion for summary judgment. *Hancock Fed. Credit Union v. Coppus*, 2015-Ohio-5312, ¶ 15 (3d Dist.), citing *Esber Beverage Co. v. Labatt USA Operating Co., L.L.C.,* 2013-Ohio-4544, ¶ 9. Thus, this Court must conduct an independent review of the evidence and arguments that were before the trial court without deference to the trial court's decision. *Tharp v. Whirlpool Corp.*, *supra*, at ¶ 23.

**{¶54}** In the instant case, the complaint filed by Link on November 22, 2021 alleged that on September 3, 2021, Link and Kelly entered into a binding written contract pursuant to which Kelly was obligated to sell approximately 120 acres of farm land to Link for $988,650.00, or $8200.00 per acre. The complaint alleged that the parties had agreed to a closing date of no later than October 8, 2021, but

that Kelly had refused to close the transaction as required by the contract. The complaint alleged that Link was ready, willing, and able to perform his remaining obligations under the contract and that he had performed all other conditions precedent required of him under the contract, but that Kelly refused to proceed to closing on the land sale.

{¶55} On September 18, 2023, Link filed a motion for partial summary judgment, requesting that summary judgment be granted in his favor on the claim for specific performance. On October 16, 2023, Kelly filed a memorandum in opposition to Link's motion for summary judgment. On November 16, 2023, the trial court filed a judgment entry overruling Link's motion for summary judgment.

{¶56} Following our de novo review of the trial court record as is relevant to the issue of summary judgment and upon applying the governing law to the facts reflected by the record, we conclude that the trial court erred in failing to grant Link's motion for summary judgment on the claim for specific performance.

{¶57} Specifically, the pleadings, depositions, answers to interrogatories, affidavits, and transcripts of evidence filed in the case at or before the summary judgment stage reflect the following: In the summer of 2021, Kelly met Nicholas Seger, a farmer from Sidney, Ohio, as a result of Seger being told that Kelly had some brood cows for sale. Seger visited Kelly at least twice to negotiate a purchase of the cows from Kelly and, during their conversations, Kelly more than once told Seger that he wanted to sell the 120 acres of farm land at issue in this case. Seger

-21-

was not in a position to buy the land but informed Kelly that Seger knew and trusted a realtor, Kevin Miller, who might be able to help Kelly sell the land. Kelly agreed to the referral, and Seger then passed along Kelly's contact information to Miller.

{¶58} Miller is a licensed real estate agent, broker, and auctioneer who runs Oakridge Realty and Auction Company, based in Lima, Ohio. In late August of 2021, after hearing from Seger about Kelly's interest in selling the land, Miller met with Kelly at Kelly's home. Kelly confirmed that he wished to sell the 120 acres, and Miller indicated that he had potential buyers interested in purchasing farm land. Because Kelly knew a number of realtors, Kelly did not want to list the land for sale with Miller at that time, but Kelly told Miller that he would sell the land if Miller could bring an offer.

{¶59} As a result of the meeting with Kelly, Miller contacted Link, who was interested in purchasing the 120 acres. Link electronically signed an offer to purchase the acreage, which Miller then presented in person to Kelly on September 3, 2021. After reviewing the paperwork with Miller, Kelly signed the purchase agreement. At that time, Kelly also signed a dual agency disclosure statement and an agency agreement with Miller.

{¶60} Pursuant to the signed purchase agreement, the sale of the land was to close on or before October 8, 2021. However, when arrangements were attempted to be made on Link's behalf to schedule the closing, Kelly refused to close the

transaction. Kelly admitted his refusal to close in his answer filed in this case and, in his deposition, testified that he had changed his mind about selling the land.

{¶61} In the trial court's November 16, 2023 decision denying summary judgment, the trial court found that there were genuine issues of material fact precluding summary judgment, based on Kelly's assertion that he did not knowingly consent to the sale of his land, and based on the trial court's conclusion that there was no evidence that Link's signature was on the contract when Kelly signed it and no evidence from which the trial court could conclude that the contract was physically presented to Kelly for his signature on September 3, 2021. The trial court noted that Kelly's capacity to contract was relevant and the trial court also found it "unusual" that no earnest money was required by the contract. (Docket No. 133, at p. 5). For those reasons, the trial court determined that "[a] genuine issue of material fact exists as to whether a contract came into existence as a result of Defendant Miller's interaction with Defendant Kelly on September 3, 2021." (*Id.*). "The competing affidavits of Defendant Kelly and Defendant Miller raise a genuine issue of material fact as to whether there was a meeting of the minds as to the essential terms of their agreement that must be resolved by evaluating their credibility at trial." (*Id.*).

{¶62} "'Generally, specific performance can be awarded if there was a valid enforceable contract that was breached.'" *Shaffer v. Shaffer*, 2006-Ohio-1997, ¶ 25,

quoting *Harris v. Reiff,* 2003–Ohio–7264, ¶ 9 (6th Dist.), citing *City of Tiffin v. Shawhan*, 43 Ohio St. 178, paragraph two of the syllabus (1885).

{¶63} "'A contract is generally defined as a promise, or a set of promises, actionable upon breach.'" *Kostelnik v. Helper*, 2002 Ohio 2985, ¶ 16, quoting *Perlmuter Printing Co. v. Strome, Inc.*, 436 F.Supp. 409, 414 (N.D. Ohio 1976). "'Essential elements of a contract include an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration.'" *Id.* "A meeting of the minds as to the essential terms of the contract is a requirement to enforcing the contract." *Kostelnik*, at ¶ 16, citing *Episcopal Retirement Homes, Inc. v. Ohio Dept. of Indus. Relations*, 61 Ohio St.3d 366, 369 (1991).

{¶64} A meeting of the minds occurs where "'a reasonable person would find that the parties manifested a present intention to be bound to an agreement.'" *Champion Gym & Fitness, Inc. v. Crotty*, 2008-Ohio-5642, ¶ 12 (2d Dist.), quoting *Zelina v. Hillyer*, 2005-Ohio-5803, ¶ 12 (9th Dist.). When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties. *Sunoco, Inc. (R & M) v. Toledo Edison Co.*, 2011-Ohio-2720, ¶ 37. Moreover, where the parties have signed an agreement, it is presumed that their minds have met. *Parklawn Manor, Inc. v. Jennings–Lawrence Co.*, 119 Ohio App. 151, 156 (1962). "'If a person can read and is not prevented from reading what he signs, he alone is responsible for his omission to read what he

signs.'" *Haller v. Borror Corp.,* 50 Ohio St.3d 10, 14 (1990), quoting *Dice v. Akron, Canton & Youngstown RR. Co.*, 155 Ohio St. 185, 191 (1951).

**{¶65}** As noted above, contractual capacity or competency to contract is one of the essential elements of an enforceable contract. *Kostelnik*, *supra*, at ¶ 16. To demonstrate a lack of competency, a party must show that his mind was so affected at the time he entered the agreement that he did not possess the ability to comprehend the nature or scope of his act, or to appreciate its effect or consequences. *Miller v. Miller*, 2004-Ohio-1989, ¶ 16 (9th Dist.). A party who has not been adjudicated as mentally incompetent is presumed to be competent, although that presumption is rebuttable. *Cameron v. State Teachers Retirement Bd. of Ohio*, 2000 WL 1753116, *4 (10th Dist. Nov. 30, 2000).

**{¶66}** In the case before us, viewing the evidence in a light most favorable to Kelly, we find that reasonable minds can come to but one conclusion, that conclusion being adverse to Kelly. Contrary to the trial court's opinion, at the summary judgment stage of this case Link presented uncontroverted evidence that he made a written offer to purchase approximately 120 acres of farm land owned by Kelly for $8200.00 per acre, with possession of the land to be granted after the fall harvest; that Link's signed and written offer to purchase was presented to Kelly in person by Kevin Miller on September 3, 2021; that Kelly signed the purchase agreement and thereby accepted the offer at that time; that the agreed upon contract

was straightforward and unambiguous; and that Kelly subsequently refused to perform on that contract because he changed his mind.

{¶67} On appeal, Kelly contends that he was not competent when he signed the purchase agreement and that, because his capacity to contract is a factual question, summary judgment was properly denied by the trial court. However, Kelly's argument disregards the requirement that he come forward with specific evidence, not just mere allegations, that his lack of capacity was a genuine triable issue, in order to defeat Link's motion for summary judgment. *See Ineos USA L.L.C.*, *supra*, at ¶ 18; Civ.R. 56(E).

{¶68} Our review of the record reflects that Kelly did not put forth any such evidence at the summary judgment stage. Kelly's son asserted in his April 19, 2023 deposition that his father has dementia, but then acknowledged that there has been no actual diagnosis of the same. Further, no timeframe as to the onset of the alleged "dementia" was provided in that deposition. Kelly's son-in-law opined in his deposition that Kelly lacked the capacity to contract on September 3, 2021, stating that opinion was based on spending time with Kelly and observing that Kelly was forgetful and tended to repeat things, but no timeframe was provided as to those observations. Kelly's son-in-law was also quick to note that he is not a medical expert. Kelly's own deposition, taken on April 3, 2022, reflects some potential confusion and apparent forgetfulness on Kelly's part at the time the deposition was taken, but provides no specific evidence as to a lack of capacity to contract at or

near the time he signed the contract at issue on September 3, 2021. Kelly also confirmed in his deposition that he has not been judged incompetent, nor has any guardianship ever been filed on his behalf to oversee his person or his property.

{¶69} Therefore, Kelly failed to put forth adequate evidence in opposition to summary judgment in support of the claim that he was not competent at the time he entered into the contract with Link. To the contrary, the only evidence in the record relating to Kelly's capacity to contract at or near the time he entered into the contract with Link stems from the deposition of Nicholas Seger, whose testimony was that, in his business dealings with Kelly shortly before Kelly met Miller, Kelly was candid and calm, in the moment, and understood what he was doing.

{¶70} Thus, as the undisputed evidence properly before the trial court at the summary judgment stage of this case established that the essential elements of a contract were present, including a meeting of the minds, and that Kelly had refused to perform on that contract without legal justification, there were no issues of material fact to be determined at trial. The trial court therefore erred in failing to grant summary judgment in favor of Link.

{¶71} The second assignment of error is sustained.

*Third, Fourth, Fifth, Sixth, Seventh, Eighth, and Ninth Assignments of Error*

{¶72} In the third through ninth assignments of error, Link asserts that the trial court erred for various reasons in granting judgment in favor of Kelly following the trial to the court on the merits of Link's complaint. However, our resolution of

the second assignment of error, *supra*, renders moot the claims raised in the third through ninth assignments of error. We therefore decline to address those assignments of error. *See* App.R. 12(A)(1)(c).

*Conclusion*

**{¶73}** Having sustained the second assignment of error, the final judgment of the Logan County Court of Common Pleas is reversed. The case is remanded to the trial court for judgment to be entered for the plaintiff-appellant, Dave Link, on his motion for summary judgment on the issue of specific performance, and for further proceedings on all other pending issues.

***Judgment Reversed
and Cause Remanded.***

**MILLER, J., concurs.**

**WILLAMOWSKI, J., Concurs Separately.**

**{¶74}** I fully concur with the reasoning of the majority as to the second assignment of error. As the conclusion resolves the issue completely, I would not address the first assignment of error.

**/jlm**