[Cite as *Huss v. Huss*, 2026-Ohio-1021.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
OTTAWA COUNTY

Susan M. Huss                                      Court of Appeals No.  {62}OT-25-021

　　　　Appellee                                   Trial Court No.  2024 DR-A 008

v.

Matthew Huss                                       **DECISION AND JUDGMENT**

　　　　Appellant                                  Decided:  March 24, 2026

* * * * *

Lisa M. Snyder, for appellee.

Howard C. Whitcomb, III, for appellant.

* * * * *

**DUHART, J.**

{¶ 1} This is an appeal by appellant, Matthew Huss, from the March 24, 2025 judgment of the Ottawa County Court of Common Pleas, Domestic Relations Division. For the reasons that follow, we affirm the trial court's judgment.

**{¶ 2}** Matthew[1] sets forth two assignments of error:

1. The trial court abused its discretion in finding that a valid agreement between the parties existed because there was evidence of an absence of a "meeting of the minds[.]"
2. The trial court abused its discretion and denied the defendant-appellant's right to due process as guar[a]nteed by Section 1 of the 14th amendment of the United States Constitution and Article 1, Section 16 of the Ohio Constitution[.]

## Background

**{¶ 3}** Matthew and appellee, Susan Huss, were married in 2001, and they had three children. Susan filed for divorce in January 2024.

**{¶ 4}** On March 21, 2025, the parties and their lawyers appeared before a trial court magistrate for the divorce trial. However, the parties and counsel represented to the magistrate that they had reached an agreement resolving all issues, which agreement was memorialized in a written Judgment Entry of Divorce ("JE"), signed by the parties and counsel. Susan's lawyer, Lisa Snyder, read the agreement (set forth in the JE) into the record, then the court asked Matthew's attorney, Brett Klimkowsky, if the recitation was correct. Matthew, rather than his attorney, answered and the following exchange occurred.

> [MATTHEW]: I -- I'd like to add another correction.
>
> There's a matter of the $471,000 in the -- kind of went off of the spreadsheet to come to an agreement, and **I can see where that $471,000 is. But I'd like to point out that we have a loan balance on the farm of the $158,202.78, but not included in this spreadsheet is the loan balance** on, basically, the farm that's going to be sold. **There's a loan balance of $17,950.** I didn't catch this before and, I mean, given we've put everything else on the table, that's a substantial sum which would basically, I guess,

---

[1] For the sake of clarity, we will use the parties' first names.

2.

when the farm is sold, if you put that say it's roughly 472,000 plus roughly 18,000, that would be 490,000. That would first come to me to make this part whole.

MR. KLIMKOWSKY: I . . . think the agreement has . . . it going to pay the debt first and then you get the 471,000.

[MATTHEW]: Right. You have to. Since we're selling it, it's --

. . .

MR. KLIMKOWSKY: The mortgage will call in the --

THE COURT: She didn't read every word, but I see here that paragraph says, **upon closing and after payment of the first mortgage due and owing upon the real estate, any real estate commissions payable, and the normal and customary cost of closing, the net closing -- the net proceeds realized therefrom shall be distributed by the first 471-ish thousand to you**.

That first mortgage due and owing, is that what he's talking about -- . . . $17,950?

MS. SNYDER: Yes. Yup. . . I mean, **we didn't put a value for this property in there. And we didn't put a mortgage in there. Whatever the net proceeds are.**

MR. KLIMKOWSKY: Because it will be what it will be.

MS. SNYDER: Right. . . Yeah. They're each paying half by doing it that way. And then the proceeds will not be distributed 50/50 so that we can adjust to be equal.

THE COURT: Right. So as long as what you understand, sir, is that t**he first mortgage due and owing is that $17,950, it is accounted for in there. Prior to your receipt of 471 and then half of the rest**.
Does that address that concern?

[MATTHEW]: I guess. I mean, I --

THE COURT: Or is that different than what you were asking for?
. . .

3.

[MATTHEW]: No.  I guess I'm just confused.  I've been --

THE COURT: Do you need a moment to talk with Attorney Klimkowsky?

[MATTHEW]: -- going and to release -- I need a moment for my leg to settle down.

THE COURT: Okay.  Do you need to stand?  You're welcome to do that if you need to.

[MATTHEW]: I have a sciatic nerve issue.  Scheduled to have back surgery on April 2nd, and there's times where it just don't do anything.  It just goes nuts on me.

THE COURT: Okay.

[MATTHEW]: This is a lot to take in.

THE COURT: Do you feel like you need time to talk with him further individually?

No, not necessarily?

MR. KLIMKOWSKY: No, I don't think so.

THE COURT: Okay.

[MATTHEW]: I've been trying to wrap my head around things all morning long.

THE COURT: Sure.

[MATTHEW]: All week long.

THE COURT: Yeah. There's a lot of moving parts here.

[MATTHEW]: This has been an ongoing problem for four months and it distracts me.  I'm usually pretty good at numbers, but for some reason I'm not able to --

I can understand . . . most of them, but --

THE COURT: **Will you let me know when you're ready to go on**?

4.

[MATTHEW]: I guess.  I mean, I don't -- from my understanding, whatever I say is not going to change anything; is that correct?

THE COURT: Well, I think . . . I was hearing what you were saying, but then going to the language, I wanted to -- I was pointing out that **it looks like the language in here** addresses that, that loan on the property to be sold that you were questioning.  It **just doesn't spell it out with detailed numbers**.  But in the language, it says that **the mortgage will be paid first.  And then, so net -- of the net proceeds, the 471,000 odd dollars net goes to you, and the 50/50 split of whatever thereafter remains**.

Then I think that's what you were asking about. Just sort of maybe in reverse. So --

[MATTHEW]: Yeah. . . I guess are you saying that --

THE COURT: Mr. Klimkowsky, do you --

[MATTHEW]: It probably doesn't matter because it's sold.  **We're going to sell it and we'll get what we get and that's that.**

THE COURT: Right.  I, you know, we can't contemplate -- [that number.]

[MATTHEW]: **After paying off the debts, I understand that. . . I guess, please proceed.  I'm finished.**

THE COURT: Mr. Klimkowsky, do you agree that on Page 4 the correction will be needed to say, in Paragraph 9, that the loan is secured by 2330 Martin Williston Road, not 1617 North Genoa Clay Center?

MR. KLIMKOWSKY: That is correct, Your Honor.

THE COURT: Okay.
. . .
**Any other corrections or, or differences in understanding that we need to address**?

MR. KLIMKOWSKY: **No**, Your Honor.

THE COURT: Okay.

(Emphasis added.)

5.

{¶ 5} Susan and Matthew were then sworn in. Susan was asked by her lawyer if the agreement read into the record was accurate, if Susan read and understood the agreement, if the agreement set forth all of the parties' assets and liabilities and if Susan made a full disclosure of what she owned and owed; Susan answered yes to every question. Next, Matthew was questioned by his lawyer and the magistrate. The relevant portions of that inquiry follow.

BY MR. KLIMKOWSKY:
. . .

Q. Okay. And I know you inquired about the [JE] that the highlights were read into the record on.
You understand that for the most part?

A. Yeah, I, I understand that -- it has a lot of things I don't agree with, but -- but apparently it's -- anything I say doesn't make a difference.

Q. Okay. And, coming to the agreement, however it may be, did you disclose all your debts and assets?

A. Yes.

Q. Okay. And I know you weren't necessarily wanting to be here, but nobody's actually literally forced you or coerced you into making the agreement?

A. Well, as I said before, kind of. I'm -- no, I think we have legitimate arguments about some of the numbers. I guess basically the one doesn't much matter, but there are a few other ones where I --

Q. So basically you're not happy, but nobody's twisting, like –

A. Well --

Q. (Inaudible)?

6.

A. You know the -- I guess the way I'm looking at it is I have more than I started with 50 years ago, so I guess I'm all right with that.
. . .

THE COURT: . . . Sir, the agreement that I have in front of me that you've reached with your attorney and wife and her counsel, that might not necessarily be an equal division of assets, but is it fair and equitable to both of you?

[MATTHEW]: I mean, yeah. I, I guess that, you know, **the whole question about the appraisal of the house taken out of consideration because it's going to be sold no matter what. So it doesn't really matter what the price is for it**. . . **I understand that**. And -- you know, I'm, I'm looking at it and I, I guess there's only one little, minor thing overall, that I suppose doesn't -- I mean, that doesn't change much in the long run anyway.

**So you know, the question is, is am I okay with the settlement? The answer is yes.**

THE COURT: Okay. So most times settlement agreements are not equal to the dollar in terms of how things are divided, and that's just because of the nature of how assets are in a marriage. You don't have just one bank account that you divide in two.

[MATTHEW]: Well, yeah.

THE COURT: So a lot of times, like, assets have unknown values at the time you come before the Court and you're sort of left to deal with those in the most equitable way based on what you do know.
Do you think that this agreement does that for you?

[MATTHEW]: **Yeah, I understand that, I mean the values are changing every second**. . . Prices go up and down by the nanosecond with those things. Literally.

THE COURT: Right. Right. So do you feel like you've entered into this agreement today voluntarily and of your own free will?
Do -- in another way, before you answer, **do you know that you, you don't have to enter into an agreement to resolve this matter? That we could go to trial. And at which time you could, you know, present evidence as far as what you feel like the divisions should be.**

[MATTHEW]: Yeah.

THE COURT: That option is open, available to you?

[MATTHEW]: **I don't believe going to trial is going to change anything and -- . . . I'm going to say I'm pretty comfortable with the settlement**.

THE COURT: **So have you entered into it today then voluntarily? No one's removed that option of trial from you, correct**?

[MATTHEW]: You put it that way, **yes**.

THE COURT: Okay. So are you - **did you sign this with your own free will**?

[MATTHEW]: **Yes**.

THE COURT: **Did anyone force you, coerce you, or threaten you to do it**?

[MATTHEW]: **No. No**.

THE COURT: Are you under the influence of any drugs or alcohol that would affect your thinking?

[MATTHEW]: My thinking has been erratic today, and I believe that stems from a nerve agent that I'm taking for -- I am going to be having surgery on my back. I've got sciatica, basically. And there's a nerve agent that --

THE COURT: You take prescription medication?

[MATTHEW]: That -- yes. It's a prescription. It's **Gabapentin**. And there's a muscle relaxer. And, right now **my mouth is dry** because of that. It says right there in the directions, or the information they give you about the drug that you're taking.

THE COURT: **Is that distracting for you today**?

[MATTHEW]: **Yes**. It's been a lot coming at me. I've been kind of working on this all week long and I had some other proposals ready, but kind of yesterday I think my final proposal was pretty close to what we have here other than I would liked the Reiman Road property to stay in my possession. So, I mean, it very well could have been done with the numbers here. The other farm could still be sold and we basically split that,

but I mean, yeah.  I mean, that -- that's -- I was trying to say something about that earlier and it seemed to fall on deaf ears, I guess.

MR. KLIMKOWSKY: Well, knowing [Matthew] personally, this -- it's as clear as it goes.  He's getting -- I mean, that's --

THE COURT: Uh-huh.  Okay.  I was going to ask you next if -- I mean, obviously, you've conversed with him throughout the day.

MR. KLIMKOWSKY: Yeah.

THE COURT: **Have there been any moments of confusion that you've experienced with [Matthew], Brett, that have caused you to think that today was not a good day to be coming to this conclusion in the case**?

MR. KLIMKOWSKY: I, I note that, as **you've probably noticed, he's clearly not happy.  But we've discussed this at length in the last days, weeks, and months. So, yeah, I'm comfortable with things**.

THE COURT: Okay.  And [Matthew], I hear you, too, that you're not -- you know, this isn't everything that you wanted or hoped for in the case.  That's not always a reason to not -- for you to not have an agreement rather than go to trial.
**So my biggest question is not whether this is what you want, but whether this is what you'd rather do than go to trial, if that makes sense**?

[MATTHEW]: Yes.  I've been wanting to do this and tried . . . mediation a couple times
. . .

THE COURT: **Do you want the Court to accept the agreement that you've reached that's memorialized here in the [JE] as the final resolution in this case**?

[MATTHEW]: **Yes**.

(Emphasis added.)

**{¶ 6}** Thereafter, based on the discussion, the agreement read into the record and the parties' testimony, the magistrate accepted the agreement as set forth in the JE, and found, inter alia, that the division of assets and debts was fair and equitable. The court asked if either party had any questions, and the following exchange occurred.

[MATTHEW]: Is there any way to ensure that my son . . . and daughter . . . will receive the full benefits of Reiman Road property?

THE COURT: I don't know what you're asking because I don't know everything about the specifics in the case. So --
[MATTHEW]: Well, I -- part of the reason that we've been going through this is [Susan] expressed that she wants something for the two children.
. . .

[SUSAN]: Three.

[MATTHEW]: In this in this scenario, which is what she asked for, which she has been granted, is the land and, you know, the value of it. . . They're still minors and, basically, I want assurance that they're -- the children are going to be able to have the land and do with it as they wish.

THE COURT: Okay. Is that request contained within the [JE]?

MS. SNYDER: It is not, Your Honor.
It's my client's intent, but it's not a restriction that we negotiated.

THE COURT: Okay. And so the only thing enforceable once these proceedings have concluded is what's contained in writing within the [JE]. And that's why we kind of ask if, if it contains everything that you -- that you want or need it to contain at the time you've entered into the agreement.
**So I think what you're asking for is assurances from Susan that property which is being awarded to her will eventually pass to the children.**
**Is that accurate**?

[MATTHEW]: **Correct**.

THE COURT: And that's not -- **that is not contained within the [JE]**. So within the bounds of this case, **my answer would have to be I can't give**

10.

**you that assurance**. But that's, that's within the bounds of this case and what's in your [JE]. . . We're talking about something that's happening in the future, though.

[MATTHEW]: Okay. It just -- it didn't dawn on me until you asked me that question about, you know, are you comfortable with the judgment and I look down here and I saw that and I thought, you know what, I'm I am okay with it as long as [the children] get that land. . . That's why -- I didn't mean to do it late, I just never thought of it before until five minutes ago.

MR. KLIMKOWSKY: I . . . don't think there's much -- **once somebody transfers property, I don't think I don't even think the Court has authority to order that -- what the disposal is afterwards. As -- and I have explained that to my client**.

THE COURT: Even if she walked out with that being her intent, she's at liberty to make changes as to how her property, at the time of her death, is handled.
So I don't know that that's something -- you know, **it's certainly not contained within the [JE] here. It's not something that the Court would have contemplated during the trial, either, if that helps**. But do you feel like that is something that would have been a, a stopping point for you in entering the agreement today?

[MATTHEW]: I'm sorry, I'm getting lost again.
What is the stopping point?
What would have been the stopping point?

THE COURT: If that was brought up ahead of the agreement being written up and not something that was agreed to from wife, would you have -- would you have chosen not to go through with the agreement?

[MATTHEW]: No. I suppose not. I mean, I guess I'm . . . I just -- I just trust people and --

MR. KLIMKOWSKY: I might add, statutorily, the children have rights in the Probate Court to the assets of [Susan] when she does pass.

THE COURT: That's accurate. I agree.

(Emphasis added.)

11.

**{¶ 7}** Subsequently, the magistrate adjourned the proceeding.

**{¶ 8}** In addition to the terms of the parties' agreement, relevant portions of the JE provide:

> 28. The parties acknowledge that each has accepted the provisions of the foregoing settlement agreement in consideration of the agreement of the parties to pay the debts as set forth in this Judgment Entry of Divorce. The parties specifically intend that the parties shall have those assets as set forth in this Judgment Entry of Divorce. The parties also specifically intend that they will be free of those liabilities which have been assumed by the other in this Judgment Entry of Divorce. The effect of this agreed allocation of assets and liabilities is in part to provide for the maintenance and support of the parties.
>
> It is the specific intention of the parties that the obligations of the parties, hereinabove, are actually in the nature of alimony, maintenance and support for the parties, and, thus, are not intended by them to be dischargeable in Bankruptcy.
>
> If either party shall file a Petition in any Bankruptcy Court . . .[and] in the event any of the filing party's obligations pursuant to the terms of this Judgment Entry of Divorce are, in fact, discharged in Bankruptcy, the parties agree that the other party shall have the right to file an appropriate motion with this Court to enforce the terms of this Judgment Entry of Divorce.
>
> 29. The parties hereby waive the necessity of the Magistrate preparing a decision in this matter pursuant to Civil Rule 53 and request that the Court adopt the agreement of the parties. The parties further hereby waive the 14[-]day objection periods in which to file objections to the Magistrate's decision, also pursuant to Civil Rule 53, and consent to the immediate adoption of this Order by the Court. . .

**{¶ 9}** The JE was signed by the magistrate and approved and signed by both parties and their lawyers. The JE was signed by the judge and filed on March 24, 2025.

**{¶ 10}** Matthew appealed.

**First Assignment of Error**

{¶ 11} Matthew argues that the trial court abused its discretion in finding that a valid agreement existed between the parties because there was evidence of an absence of a meeting of the minds. He posits that a valid agreement could not exist absent a mutual understanding of the terms of the contract and agreement to those terms. In support, he cites to *Kostelnik v. Helper*, 2002-Ohio-2985, ¶ 16 and *Rulli v. Fan Co.*, 79 Ohio St.3d 374, 376 (1997).

{¶ 12} Matthew submits that whether or not there was a meeting of the minds depends on the parties' outward expressions and how a reasonable person would judge them. He argues there were at least three exchanges during the hearing where the court could have observed that a meeting of the minds was somewhat suspect or did not exist. First, he told the court, after the court inquired, that he was under the influence of and suffering the effects of Gabapentin, a muscle relaxer, which was distracting to him. Second, he indicated that he was confused and needed a moment for his leg to settle down, due to a sciatic nerve issue, which had been ongoing for four months. Third, when he was made aware that it was possible that his minor children would not inherit his real property at the time of Susan's death, he indicated to the court that he wanted assurances that the land would pass to the minor children. He claims he told the court he was not in agreement with a transfer of real property to Susan without a provision that the property be passed on to the parties' minor children, and this point was essential for his agreement on that matter. However, Matthew contends that rather than stopping the proceedings and resolving that issue to satisfy his concern, the court dismissed it since it had not been part

13.

of the agreement and it "was not within the jurisdiction of the trial court as it was written."

{¶ 13} Matthew argues that because the trial court left the three exchanges unaddressed, the court abused its discretion in finding that the proposed settlement agreement was fair and reasonable. He requests that the JE be set aside and vacated and that the matter be remanded to the trial court.

## Standard of Review

{¶ 14} A trial court's approval of a settlement agreement and incorporation of that agreement into a divorce decree or judgment entry is reviewed for abuse of discretion. *Zamonski v. Wan*, 2003-Ohio-780, ¶ 5 (2d Dist.). An abuse of discretion implies that the trial court's ruling was arbitrary, unreasonable, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

## Law

{¶ 15} When parties enter into a settlement agreement in the presence of the trial court, the agreement constitutes a binding contract. *Walther v. Walther*, 102 Ohio App.3d 378, 383 (1st Dist. 1995), citing *Spercel v. Sterling Industries, Inc.*, 31 Ohio St.2d 36 (1972), paragraph one of the syllabus. "'A contract is generally defined as a promise, or a set of promises, actionable upon breach. Essential elements of a contract include an offer, acceptance, contractual capacity, consideration . . . , a manifestation of mutual assent and legality of object and of consideration.'" *Kostelnik v. Helper*, 2002-Ohio-2985, at ¶ 16, quoting *Perlmuter Printing Co. v. Strome, Inc.*, 436 F.Supp. 409, 414 (N.D.Ohio 1976). "A meeting of the minds as to the essential terms of the contract is a

14.

requirement to enforcing the contract." *Kostelnik* at ¶ 16, citing *Episcopal Retirement Homes, Inc. v. Ohio Dept. of Indus. Relations*, 61 Ohio St.3d 366, 369 (1991).

{¶ 16} Trial courts have the authority to enter a judgment, by consent of the parties, in order to execute a compromise and settlement of the parties' claims for relief. *Infinite Sec. Sols., L.L.C. v. Karam Properties, II, Ltd.*, 2015-Ohio-1101, ¶ 27. In a consent decree, the parties stipulate to end the lawsuit by agreeing to specific terms which the trial court enforces as its judgment by journalizing a judgment entry reflecting the terms of the settlement agreement. *Id.*

{¶ 17} In *Stephens v. Stephens*, 2024-Ohio-106, ¶ 13 (6th Dist.), this court noted that it has long been recognized that when a trial court has entered a consent decree, the decree is not subject to direct attack, other than for irregularity or fraud in the procurement of the decree. In support, this court cited *Salpietro v. Salpietro*, 2023-Ohio-169, ¶ 13 (6th Dist.), *Sponseller v. Sponseller*, 110 Ohio St. 395, 399 (1924) and *Harding v. Harding*, 198 U.S. 317, 335 (1905). *Stephens* at ¶ 13. Thus, "[i]n the absence of fraud, duress, overreaching or undue influence, or of a factual dispute over the existence of terms in the agreement, the trial court has the discretion to adopt the settlement as its judgment." *Wade v. Wade*, 2003-Ohio-686, ¶ 7 (6th Dist.), citing *Walther* at 383.

{¶ 18} Fraud is defined as a deliberate deception practiced by one person in order to gain an unlawful or unfair advantage over another person. *State v. Lowenstein*, 109 Ohio St. 393, 400 (1924).

{¶ 19} Duress exists when: (1) one party involuntarily accepted another party's terms; (2) the circumstances permitted no other alternative; and (3) the circumstances

were the result of coercive acts of the other party. *Blodgett v. Blodgett*, 49 Ohio St.3d 243, 246 (1990). "To avoid a contract on the basis of duress, a party must prove coercion by the other party to the contract. It is not enough to show that one assented merely because of difficult circumstances that are not the fault of the other party." *Id.*

{¶ 20} Undue influence is defined as any improper or wrongful constraint, machination, or urgency of persuasion whereby the will of a person is overpowered and that person is induced to do or forbear an act which he or she would not do or would do if left to act freely. *Marich v. Knox Cnty. Dept. of Human Services*, 45 Ohio St.3d 163, 166 (1989).

{¶ 21} The elements of undue influence are (1) a susceptible person, (2) another person who has the opportunity to exert influence, (3) improper influence was exerted or attempted, and (4) the effect of the influence is evidenced in the results. *West v. Henry*, 173 Ohio St. 498, 501 (1962). The conduct must "so overpower and subjugate the mind" of the susceptible party as to destroy the party's free agency such that the party is expressing the will of another. *Id.*

{¶ 22} "The term 'overreaching' is used in the sense of one party by artifice or cunning, or by significant disparity to understand the nature of the transaction, to outwit or cheat the other." *Gross v. Gross*, 11 Ohio St.3d 99, 105 (1984).

**Analysis**

{¶ 23} Upon review of Matthew's brief, we note that he did not specifically allege that the settlement agreement was procured by fraud, duress, overreaching or undue influence, nor did he argue there was a factual dispute over the terms of the settlement

agreement. Rather, he claims there was no meeting of the minds because there were three exchanges during the hearing where the court could have observed that a meeting of the minds was somewhat suspect or did not exist, but the court did not address the exchanges.

{¶ 24} A review of the record reveals that the magistrate addressed each of the three exchanges in turn. As to the first exchange, that Matthew was under the influence of Gabapentin which was causing a distraction, the magistrate thoroughly questioned Matthew about any distraction or confusion, asking, inter alia, if Matthew wanted to go to trial or if he wanted the court to accept the settlement. The magistrate also inquired of Matthew's counsel if Matthew had any moments of confusion, and counsel responded that Matthew was clearly not happy, but counsel assured the magistrate that counsel discussed the issues with Matthew at length, and counsel was comfortable with things.

{¶ 25} Regarding the second exchange, that Matthew indicated he was confused and needed a moment for his leg to settle down due to a sciatic nerve issue, the magistrate accommodated Matthew's physical discomfort by informing him that he could stand up, asking if he wished to talk with his counsel and telling Matthew to let the magistrate know when he was ready to proceed. Further, as set forth above, the magistrate questioned Matthew and his counsel about any confusion Matthew may have had.

{¶ 26} Regarding the third exchange, that Matthew wanted assurances certain land would pass to the minor children, the record shows the magistrate, Matthew's counsel and Susan's counsel all addressed this issue. And, while the magistrate informed Matthew that he could not have assurances that the children would inherit the property,

17.

Matthew himself advised the magistrate that "part of the reason that we've been going through this" is that Susan "expressed that she wants something for the . . . children . . . [and Susan] asked for . . . [and] has been granted . . . the land." Thus, according to Matthew, it was Susan's intent for the children to have the property. In addition, the court questioned Matthew if the provision was brought up before the JE was written and Susan did not agree to the provision would he have gone through with the agreement, and he answered affirmatively.

{¶ 27} Having examined the record, we find Matthew did not identify any fraud, duress, undue influence, overreaching or a factual dispute over the terms of the settlement agreement which could support a finding that the trial court abused its discretion in accepting the settlement agreement as the JE.

{¶ 28} The record shows that the parties, with the assistance of counsel, negotiated the terms of the settlement which was memorialized in a detailed 10-page written JE (exclusive of exhibits), read into the record and accepted by the magistrate following her in-depth questioning of Matthew as to whether he, along with Susan, wished to enter into the settlement agreement. The magistrate went to great lengths and meticulously questioned Matthew to ensure that he understood the settlement agreement and that he was entering the agreement voluntarily instead of going to trial. The magistrate answered Matthew's questions, the magistrate allowed Matthew to have time to deal with his leg issue and the magistrate offered Matthew opportunities to confer with his counsel. Matthew, as well as Susan and the parties' lawyers, signed the JE, as did the magistrate and the judge.

18.

{¶ 29} We therefore find, as supported by the record, that Matthew and Susan made a binding and enforceable settlement agreement, and the trial court did not abuse its discretion in finding that a valid agreement, the JE, existed.  Accordingly, we find Matthew's first assignment of error not well-taken.

### Second Assignment of Error

{¶ 30} Matthew argues the trial court abused its discretion and denied his right to due process as guaranteed by Section 1 of the 14th Amendment of the United States Constitution and Article 1, Section 16 of the Ohio Constitution.  He contends that the three exchanges mentioned above provided sufficient indicators for the trial court to find that Matthew's "agreement" was not voluntary, intelligent or freely given.  He submits the trial court should have rejected the parties' "settlement agreement" and set the matter for further hearing in which evidence could be adduced regarding Matthew's concerns.  Since the trial court did not do so, Matthew insists his due process rights were violated.

### Standard of Review

{¶ 31} "A fundamental requirement of due process is 'the opportunity to be heard.' *Grannis v. Ordean*, 234 U.S. 385, 394 . . . [(1914)].  It is an opportunity which must be granted at a meaningful time and in a meaningful manner."  *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965).  The question of whether due process requirements have been met is a question of law we review de novo.  *McRae v. State Med. Bd. of Ohio*, 2014-Ohio-667, ¶ 36 (10th Dist.).

19.

**Law and Analysis**

{¶ 32} In *Youngstown v. Traylor*, 2009-Ohio-4184, ¶ 8, the Supreme Court of Ohio stated that "[t]he right to procedural due process is found in the Fourteenth Amendment to the United States Constitution and Section 16, Article I of the Ohio Constitution." At a minimum, due process requires notice and the opportunity to be heard. *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950). A hearing before judgment, with a full opportunity to present all of the evidence and arguments which a party deems important, is all that is adjudged vital under the guaranty of due process of law. *Reed v. Morgan*, 2012-Ohio-2022, ¶ 11 (12th Dist.).

{¶ 33} Here, upon review of the record and the applicable law, we find that Matthew had ample opportunity to present arguments and evidence at the hearing, he was asked repeatedly if he wished to enter into the settlement agreement and he was informed he could go to trial. When given the option of going to trial, Matthew advised the magistrate that he did not believe going to trial was going to change anything and he was pretty comfortable with the settlement. At no time did Matthew request that the hearing end, that the magistrate reject the settlement agreement, that a trial be held or that a further hearing be held so evidence could be adduced as to his "concerns." Furthermore, as mentioned above, the magistrate addressed the three exchanges prior to accepting the settlement agreement/JE.

{¶ 34} Based upon the record, we hold that Matthew was afforded due process at the settlement agreement hearing, thus he was not denied his right to due process. Accordingly, Matthew's second assignment of error is not well-taken.

20.

{¶ 35} The March 24, 2025 judgment of the Ottawa County Court of Common Pleas, Domestic Relations Division, is affirmed. Pursuant to App.R. 24, appellant, Matthew Huss, is ordered to pay the costs incurred on appeal.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Gene A. Zmuda, J.           _____
JUDGE

Myron C. Duhart, J.       

Charles E. Sulek, J.       _____
CONCUR.                        JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.